[Cite as *Rembowski v. Rudolph Libbe, Inc.*, 2020-Ohio-2864.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Nicholas Rembowski                                    Court of Appeals No. L-19-1091

      Appellant                                      Trial Court No. CI0201703251

v.

Rudolph/Libbe Inc., et al.                            **DECISION AND JUDGMENT**

      Appellees                                      Decided:  May 8, 2020

* * * * *

Kevin J. Boissoneault and Jonathan M. Ashton, for appellant.

Christopher W. St. Marie, Aaron S. Evenchik and Douglas J.
Suter, for appellee Rudolph/Libbe Inc.

Justin D. Harris and Adam Borgman, for appellee Dunbar
Mechanical, Inc.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Nicholas Rembowski, appeals the April 10, 2019 judgment of the

Lucas County Court of Common Pleas which granted summary judgment to appellees

Dunbar Mechanical, Inc. and Rudolph/Libbe Inc. ("RLI").  Because appellees did not

owe a duty of care to appellant, we affirm the trial court's judgment.

## Background

{¶ 2} On or about July 14, 2016, appellant began working at the Fiske/Lubriplate facility in Toledo, Ohio. This facility makes food grade lubricants, greases, and oils. The facility decided to upgrade its facilities and hired Dunbar as its general contractor to oversee the project. The project included the creation of a mezzanine level of the facility by pouring concrete, creating two new staircases, and installing six large kettles into the new mezzanine level. To install the kettles, large holes and curbs were created in the mezzanine as well. Large holes also had to be cut in the roof so that the kettles could be flown in from a different site.

{¶ 3} Dunbar hired RLI as a subcontractor to pour the concrete for the mezzanine level. RLI completed the mezzanine level and installed plywood coverings over the holes for the kettles in early July 2016. Most of their employees then left the jobsite. Two RLI workers remained on site to wrap up the job site. In order to reach the new mezzanine level, RLI constructed two staircases that were about 100 feet away from one another and separated by a large firewall.

{¶ 4} On July 18, 2016, in anticipation of the kettles arriving, Dunbar ordered RLI to remove the hole coverings and to secure the mezzanine level. RLI completed the removal of the hole coverings and secured the mezzanine level by placing red danger tape on the staircases. This was the last day RLI employees were on the jobsite.

{¶ 5} Dunbar hired appellant's employer GEM, Inc. to cut the large holes in the roof and to install the curbs for the kettles. Appellant is an experienced ironworker with

2.

years of experience. Appellant began working on the site on July 14, 2016, and worked at the site for the next five days. Appellant's work entailed working on the mezzanine level and working above and below the roof to cut the required holes. Appellant was on the job site when the coverings for the holes were removed. He was aware of the uncovered holes prior to his injury.

{¶ 6} Dunbar instructed RLI to secure the mezzanine to ensure no one would be injured by the uncovered holes. Dunbar's project manager Dan Huguley stated in a deposition he did not inform or supervise how RLI secured the mezzanine area. RLI removed the hole covers and placed red danger tape on the staircases to ensure people would not use the staircase to get to the mezzanine level. RLI's employees then turned the jobsite over to Dunbar and left the site. It was later discovered that the kettles would be delivered a week later than expected, but Dunbar did not ask RLI to recover the holes on the mezzanine level.

{¶ 7} On July 19, 2016, GEM completed its portion of the project and prepared to leave the facility for another jobsite. Appellant's foreman ordered another GEM employee to retrieve tools from the mezzanine level. Appellant volunteered to go up to the level to retrieve the tools instead of the other GEM employee. Appellant walked up one of the staircases, ducked under the red danger tape, and did not utilize any fall protection while near the kettle holes. While appellant was winding an extension cord, he lost his balance and fell through one of the holes. Appellant suffered several broken bones and other injuries from his fall.

3.

{¶ 8} The parties argue about who placed the red tape and for what purpose. Appellant states a GEM employee placed the red tape on the staircases to warn others that the GEM workers were working above the mezzanine level for several days. He testified that during his days on the site, he would go under the red tape or reattach the red tape after going through it on one of the staircases. Appellees argue that RLI placed the red tape at the direction of Dunbar to serve as "administrative control" to stop workers from entering the mezzanine level while the holes were uncovered.

{¶ 9} There are also disputes as to when the red tape was placed on the staircase. Appellant testified that the tape was placed in mid-July when GEM workers first began cutting holes in the roof. Appellees state that the red tape was placed by RLI when they removed the hole coverings to stop people from entering the mezzanine level.

{¶ 10} Several pictures demonstrated the red tape that was placed on the two staircases. On the staircase that appellant accessed for his work, there was red tape, but it was not securely attached and looked as though it was taken off and reattached several time. This aligns with appellant's testimony that GEM workers went through the red tape as they completed their work on the project.

{¶ 11} The other staircase is almost encompassed in red tape and has a danger sign on the red tape. It should be noted that additional red tape and the sign were added after appellant fell. The red tape on this staircase does not appear as ragged or used as the other staircase.

**Arguments on Summary Judgment**

{¶ 12} In its motion for summary judgment, Dunbar argues that it did not actively participate in appellant's work or employees, that Dunbar did not direct appellant on the day of the fall, and that GEM's employee ordered appellant to enter the mezzanine area to quickly retrieve the tools from a dangerous area. In the alternative, Dunbar argues that appellant assumed the risk when he entered a dangerous floor and through red danger tape without taking any safety precautions.

{¶ 13} RLI argues that because RLI and GEM were both subcontractors with no contractual relationship, RLI was only required to exercise ordinary care regarding GEM and its workers because it did not actively participate in appellant's work. RLI did not owe a duty to appellant because RLI did not retain control over the workplace and left the jobsite completely before appellant fell. In the alternative, RLI argues that even if it did owe a duty to appellant, he was participating in an inherently dangerous activity and was injured by an open and obvious hazard.

{¶ 14} In response, appellant argues that Dunbar and RLI owed him a duty of care because they controlled a critical variable in appellant's injury, the hole coverings. Appellant also argues that Dunbar participated in and retained control of the jobsite because it approved the use of the red tape before the RLI employees left.

{¶ 15} Appellant points to the red tape as a material dispute between the parties, which he argues bars the granting of summary judgment. Appellant testified that one of his coworkers placed the red tape on the stairs to warn people that the ironworkers were

5.

cutting holes in the roof above the mezzanine level. Appellees argue that RLI placed the red tape onto the stairs as an administrative control to stop people from entering the mezzanine level with the open hole coverings. Appellant also points to the fact that the red tape and other administrative controls do not meet the requirements of Dunbar's safety manual.

{¶ 16} In its reply, RLI reiterates that it did not actively participate in appellant's work and argues that appellant conflates the legal precedent by adding the "critical variable" language from the analysis regarding a general contractor and subcontractor relationship to the analysis regarding two separate subcontractors. RLI argues that as two subcontractors with no contractual privity and no supervisory control over one another's work, the parties did not owe each other a duty other than ordinary care.

{¶ 17} Dunbar focuses its reply on the fact that it did not owe a duty to appellant because it did not actively participate in appellant's work. Dunbar also argues that appellant misapplies case law to this matter because his case law involved a property owner rather than a general contractor.

### Trial Court Decision

{¶ 18} The trial court agreed with appellees and found that they did not owe appellant a duty of care because they did not control the critical variable in his work that caused his injury. The trial court found that the critical variable was appellant deciding to go get his tools, rather than the uncovering of the kettle holes by RLI. The trial court also found that his accident was not foreseeable and that appellant failed to take proper safety

6.

measures while gathering his tools. The court found that this variable was under appellant's control and that he only took orders from GEM, rather than appellees.

## Assignment of Error

{¶ 19} Appellant brings one assignment of error for our review:

> The trial court erred when it granted summary judgment in favor of Appellees Dunbar Mechanical, Inc. and Rudolph/Libbe Inc.

## Law

{¶ 20} An appellate court reviews a trial court's summary judgment decision de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment will be granted when no genuine issues of material fact exist when after, construing all the evidence in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). *Accord Lopez v. Home Depot, USA, Inc.*, 6th Dist. Lucas No. L-02-1248, 2003-Ohio-2132, ¶ 7. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleading, but must respond with specific facts showing there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984).

{¶ 21} To establish a common law action for negligence, a plaintiff must demonstrate the existence of a duty, a breach of that duty, and that an injury occurred that was the proximate result of that breach. *Di Gildo v. Caponi*, 18 Ohio St.2d 125, 247 NE.2d 732 (1969). A defendant's duty to a plaintiff depends on the relationship between

7.

the parties and the foreseeability of injury to someone in the plaintiff's position. *Huston v. Konieczny*, 52 Ohio St.3d 214, 217, 556 N.E.2d 505 (1990). "Injury is foreseeable if a defendant knew or should have known that his act was likely to result in harm to someone." *Id*.

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees * * * shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees * * *.

R.C. 4101.11.

> No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders to adopt and use methods and processes reasonably adequate tor ender such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health safety, and welfare of such

8.

employees or frequenters.  No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

R.C. 4101.12.

{¶ 22} "The duty owed to frequenters, including employees of other companies, is not more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring the premises be kept in a reasonably safe condition and warning be given of dangers of which he has knowledge." *Morris v. Collier Construction*, 5th Dist. Stark No. 218CA00167, 2019-Ohio-3946, ¶ 14, citing *Westwood v. Thrifty Boy*, 29 Ohio St.2d 84, 278 N.E.2d 673 (1972), paragraph one of the syllabus. These requirements, however, do not normally apply to a general contractor's duty to an independent contractor who is engaging in inherently dangerous work.  *Id.*, citing *Frost v. Dayton Power & Light Co.*, 138 Ohio App.3d 182, 190, 740 N.E.2d 734 (4th Dist.2000). When an independent contractor undertakes work for another knowing that there is a real or potential danger to one of their employees, "no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor."  *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103, 113 N.E.2d 629 (1953), paragraph one of the syllabus.

{¶ 23} An exception to this rule exists however.  "One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or

9.

death of an employee of the independent contractor." *Hirschbach v. Cincinnati Gas & Elec. Co.*, 6 Ohio St.3d 206, 452 N.E.2d 326 (1983), syllabus. A general contractor actively participates in a subcontractor's work when "the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury." *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 337, 650 N.E.2d 416 (1995). "Thus, active participation means more than supervising or coordinating. The employer must exercise control over the work activities or retain control over a critical variable in the workplace before it can be held liable to the independent contractor's employees." (Citations omitted). *Pfaff v. Pahl Ready Mix Concrete, Inc.*, 6th Dist. Lucas No. L-01-1306, 2002 WL 126073 (Feb. 1, 2002). A construction site is an inherently dangerous place and a subcontractor who works at a construction site engages in inherently dangerous work. *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 478, 650 N.E.2d 1352 (1995), fn. 4.

{¶ 24} "An independent contractor who lacks a contractual relationship with a second independent contractor owes no affirmative duty beyond that of ordinary care to the employees of the second contractor, where the first contractor does not supervise or actively participate in the second contractor's work." *Kucharski v. Nat'l Eng. & Contracting Co.*, 69 Ohio St.3d 430, 633 N.E.2d 515 (1994), syllabus. "[W]hen two or more independent contractors are engaged in work on the same premises, it is the duty of each contractor, in prosecuting its work, to use ordinary and reasonable care not to cause injuries to the employees of another contractor." *Id.* at 434.

10.

{¶ 25} That is not to say that multiple subcontractors can never be liable to one another. "Applying the 'active participation' definition as stated in *Bond* or *Sopkovich* is often unworkable in situations involving multiple subcontractors since the roles among subcontractors are typically not supervisory in nature." *Nibert v. Columbus/Worthington Heating & Air Conditioning*, 12th Dist. Fayette No. 2009CA-08-015, 2010-Ohio-1288, ¶ 22. Some subcontractor tasks will overlap and occupy the same workspace, even if there is no supervisory relationship. *Id.* Therefore, subcontractors still must exercise a duty of ordinary and reasonable care to other subcontractors when executing their jobs in an inherently dangerous work environment. *Id.*

## Analysis

### RLI did not owe appellant a duty of care because of their relationship

{¶ 26} RLI only owed a duty of ordinary care to GEM and its employees because they were separate subcontractors with no supervisory control over one another. RLI and GEM were coequal independent contractors who had no privity between them and RLI did not control or supervise GEM's work.

{¶ 27} Although both GEM and RLI shared a workspace, we cannot find that RLI actively participated in the work of appellant and GEM. RLI did not participate in any manner with the work of GEM. No permission was granted or denied to GEM. Further, they did not control a critical variable that caused appellant's injuries.

{¶ 28} Appellant argues rather that RLI actively participated in his work because RLI removed the hole coverings, which appellant argues was the critical variable in his

11.

injury. We do not agree. First, RLI had no control over any part of the site at the time of appellant's injury as RLI turned over any control of the job site to Dunbar after removing the hole coverings. Second, appellant's injury was not merely caused by the lack of hole coverings. His injury was primarily caused by entering a dangerous area without safety precautions. He did this at the direction of his own employer GEM, rather than at the direction of RLI.

{¶ 29} Either way, we cannot find that RLI retained control over the hole coverings; they were ordered to remove the hole coverings by Dunbar and did not exercise any control over appellant's work. They completed their scope of work that they were ordered to complete and left the job site.

{¶ 30} *Kucharski* is on point in our analysis. In that case, a general contractor was hired to build a new settling tank for a wastewater treatment plant for a city. *Kucharski*, 69 Ohio St.3d at 430-431. The general contractor directly reported to the city. *Id*. Another contractor was hired to complete electrical work who also reported directly to the city. *Id*. The process of creating this new tank involved creating a large tank that was partially covered by a concrete deck. *Id*. While the concrete deck was being poured, scaffolding and a wooden deck were installed to permit workers to install the concrete deck. *Id*. Wooden guardrails were also installed around the settling tank because it stood six feet off the ground. *Id*. When the concrete deck was installed, the scaffolding and guardrails were removed. This left a large concrete deck hanging over the rest of the empty settling tank with no other covering. *Id*.

12.

{¶ 31} While attempting to complete his task on the concrete deck, he fell from the concrete deck into the tank, where he was injured. *Id.* The previous day the electrical contractor determined that, although there were no longer any safety rails, the concrete deck was large enough that continued work on the deck was safe. *Id.* The contractor who installed the deck did not control or ask the injured worker to complete work on the deck. *Id.* The Ohio Supreme Court found that the general contractor did not owe a duty to the worker who was injured because of the separate nature of the contractor's work and the lack of active participation in the worker's injury. *Id.* at 434. The court rather found that it was because the worker's supervisor determined it was safe to work on the concrete deck without safety equipment that caused the worker's injury rather than the general contractor's removal of the guardrails. *Id.*

{¶ 32} Here, as in *Kucharski*, RLI and GEM were separate contractors who had no control or participation in each other's work. The two companies did not have privity with one another, but their workspaces did overlap. And just as in *Kucharski*, appellant was aware of the dangers that were present, and his supervisor determined that no safety precautions needed to be taken. RLI was not appellant's employer and exercised no control over him. Therefore, RLI did not owe a duty to appellant.

**Dunbar did not actively participate in appellant's work**

{¶ 33} A different analysis is required to determine Dunbar's duty of care to appellant because Dunbar retained some control over the jobsite as a general contractor. It is undisputed that appellant was working an inherently dangerous job on a construction

13.

site. Appellant was aware of these dangers as he admitted that he knew the holes existed and that they were uncovered. Appellant volunteered to go onto the mezzanine level despite this knowledge.

{¶ 34} It also appears undisputed that Dunbar did not grant or deny appellant permission or order appellant to go past the red danger tape to the mezzanine level. Appellant was implicitly permitted to enter the mezzanine level of the jobsite by his supervisor who ordered GEM workers to retrieve tools from the mezzanine level. Dunbar ordered instead that no one be permitted to enter the mezzanine level by securing the staircases.

{¶ 35} Thus, the question becomes whether Dunbar retained or exercised control over the critical variable in appellant's injury. Appellant argues that the critical variable was the removal of the hole coverings. Dunbar argues the critical variable was the direction to bypass red danger tape without proper safety protections. We agree with Dunbar.

{¶ 36} It was not the mere fact that the hole coverings were removed that caused appellant's injuries. It was appellant's entry into a dangerous area and past red danger tape in order to retrieve tools. Appellant's entry was ordered by appellant's employer GEM, rather than Dunbar and RLI. Appellant's entry into this dangerous area led to his injury and his retrieval of the tools directly led to his fall.

{¶ 37} Even if we found that the hole coverings were the critical variable in appellant's injury, Dunbar did not retain control over the variable. Dunbar instructed the

14.

holes to be removed and for the staircases to be restricted. Dunbar never approved of the work by RLI or gave them specific instructions on how to carry out their work assignment. Therefore, Dunbar would not have been found to have actively participated in the critical variable of appellant's injury if the variable was the uncovered hole.

{¶ 38} Therefore, we find appellant's assignment of error not well-taken and affirm the April 10, 2019 judgment of the Lucas County Court of Common Pleas. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____
CONCUR.

_____
JUDGE

---

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.