[Cite as *Kruthaup v. Schoen Builders, L.L.C.*, 2023-Ohio-2090.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

| | |
|---|---|
| Joseph Kruthaup | Court of Appeals No. WD-22-057 |
| Appellant | Trial Court No. 2020CV0439 |
| v. | |
| Schoen Builders, LLC, et al. | **DECISION AND JUDGMENT** |
| Appellee | Decided: June 23, 2023 |

* * * * *

Eric W. Henry, for appellant.

Shannon J. George, for appellee..

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, Joseph Kruthaup, appeals the judgment of the Wood County Court of Common Pleas, granting a motion for summary judgment filed by appellee, Schoen Builders, LLC ("Schoen"), and thereby dismissing appellant's negligence claims against Schoen. For the reasons that follow, we reverse.

## A. Facts and Procedural Background

{¶ 2} On February 12, 2019, appellant was working with Christopher Tammarine as a drywaller on a home that was being built in Perrysburg, Ohio (the "Fry home"). At the time, Tammarine was hired as an independent subcontractor of Justin St. Clair, who was himself hired as a subcontractor to hang and finish the drywall at the Fry home by Schoen, the general contractor responsible for building the home.

{¶ 3} As appellant was carrying a sheet of drywall along a balcony walkway with an unprotected edge on the second story of the home, he stepped off the edge, fell, and sustained injuries. Consequently, on November 13, 2020, appellant filed a complaint, which he amended on February 12, 2021, asserting claims of negligence and negligence per se and seeking to recover damages from appellees, Schoen Builders, LLC, Justin St. Clair, Christopher Tammarine, and several unknown subcontractors.[1]

{¶ 4} On February 12, 2021, Schoen filed its answer, in which it denied any liability arising out of appellant's fall at the Fry home and asserted that appellant was an independent contractor who was responsible for compliance with all safety regulations at the construction site. Thereafter, the matter proceeded through pretrial motion practice

---

[1] During the pendency of the proceedings before the trial court, appellant dismissed his claims against Tammarine and St. Clair. Additionally, the unnamed defendants were dismissed by the trial court after it found that Schoen was entitled to summary judgment on all claims asserted by appellant. Appellant does not challenge the dismissal of the unnamed defendants on appeal.

2.

and discovery. During discovery, several witnesses were deposed. The following is a summary of the testimony elicited during the depositions.

{¶ 5} Tammarine was the first witness to be deposed. At the outset of the deposition, Tammarine testified that he is a self-employed drywaller who hangs drywall on exposed wood framing and prepares the drywall "to allow the finishers to come in an do their portion." Tammarine indicated that he was regularly hired by St. Clair as an independent contractor to perform such work. In such cases, St. Clair paid Tammarine in cash and did not provide Tammarine with any written instructions or work orders. Tammarine confirmed that this was the arrangement between he and St. Clair concerning the work performed at the Fry home. Moreover, Tammarine testified that all of his communications concerning his work were handled by St. Clair. Tammarine did not get his work orders from Schoen, nor was he ever paid by Schoen. Nonetheless, Tammarine was familiar with Schoen's owner, Aaron Schoen, and Schoen's employees, Matt and Tom Brusoe, having previously worked on Schoen home building projects.

{¶ 6} Tammarine first met appellant in 2016 through a mutual friend. After learning of appellant's construction experience, Tammarine decided to utilize him to assist with drywall hanging projects. The two began working together in 2016, and by the time of appellant's accident, they had worked together on between 10 and 15 jobs. According to Tammarine, he paid appellant in cash on a daily basis.

{¶ 7} On the day of the accident, Tammarine picked appellant up from his residence and the two men traveled together to the Fry home. This was their first day on

3.

the Fry home site. Upon arrival to the construction site, they hauled their tools to the second floor of the unfinished home over the course of several trips. Tammarine testified that Schoen did not have a supervisor on site at the Fry home on the day of the accident, and he stated that nobody from Schoen was directing or controlling the drywall work he and appellant were subcontracted to perform.

{¶ 8} Approximately one hour after arriving at the Fry home, Tammarine and appellant began carrying a large sheet of drywall along a balcony on the second floor. The balcony overlooked an open foyer and the first floor below. According to Tammarine, there was no railing installed along the edge of the balcony facing the foyer at the time. Tammarine stated that appellant would have had an opportunity to observe the lack of a railing as he hauled tools into the home from Tammarine's truck upon arrival at the home. However, Tammarine admitted that he never noticed the lack of railing prior to the accident.

{¶ 9} As Tammarine and appellant were carrying the sheet of drywall around a corner toward their ultimate destination, appellant stepped off the unprotected edge and fell to the floor below, a distance of approximately nine feet. Tammarine confirmed that he did not witness the fall, and nobody else was present at the time to witness the fall. When asked whether appellant fell because of the lack of a railing, Tammarine stated that it was a combination of the lack of a railing and a "lack of paying attention on [appellant's] part."

4.

{¶ 10} Tammarine was subsequently asked about whether a railing should have been installed along the balcony at this stage in the construction process. Tammarine responded: "I don't know what the code standards are, to be honest with you. I just noticed them from before hanging drywall that usually builders have them up. After he obviously fell is when I said, 'Huh, you know, man, I wonder – I wonder why there ain't a railing there.'"

{¶ 11} Following the fall, Tammarine looked around to see if a temporary railing was lying around in the home, but never found one. He speculated that perhaps the drywall delivery company removed such a railing when they delivered the drywall. However, Tammarine was unaware of whether a railing was ever installed at the Fry home prior to appellant's fall.

{¶ 12} Tammarine confirmed that balconies such as the one off of which appellant fell were typically guarded by a railing by this point in the construction process. Tammarine went on to indicate that no such railing was installed at the Fry home after the accident. Notwithstanding this fact, Tammarine stated that he completed his work at the home without "one bit" of concern for his safety.

{¶ 13} Tammarine was unsure as to whose responsibility it was to erect such a railing. He testified that he never raised the issue of a lack of railing along the balcony in the Fry home with anyone at the job site, because he "didn't think it was really an issue." Later, Tammarine stated that he did not ask anyone to install a railing at the Fry home.

5.

Further, he indicated that appellant never asked anyone to install a railing at the Fry home while in his presence.

{¶ 14} Following the fall, Tammarine was hanging drywall in another home and noticed that there was no temporary railing installed on a second-floor open area. With appellant's fall in mind, Tammarine asked Matt, Schoen's project manager, to have a railing installed. Matt agreed, and the railing was promptly installed. Tammarine confirmed that he asked Matt to install the railing because Matt had the power to erect the railing. When asked whether the balcony area from which appellant fell was under Schoen's control, Tammarine stated "that is correct."

{¶ 15} As to the nature of Schoen's oversight of his work, Tammarine stated that Schoen "did not come in and tell me how to hang the drywall." He noted that he brings his own tools to each job and sets his own hours. As to safety on the job, Tammarine stated that, as a drywall hanger "you've kind of got to know I guess your surroundings to make sure you stay safe."

{¶ 16} Matt Brusoe was the next witness to be deposed. He stated that he is a project manager for Schoen and reports directly to Schoen's owner, Aaron Schoen. Matt and Aaron are cousins.

{¶ 17} At the time of the deposition, Matt had worked for Schoen for approximately 15 years. Concerning his job duties, Matt testified that he oversees the project, schedules subcontractors and material deliveries, and responds to questions and concerns from subcontractors and homeowners. Asked how often he picks up a hammer,

6.

Matt responded, "very rarely. * * * I'm not like out there swinging a hammer next to the framers, I'm not out there helping like nail drywall to the walls or anything like that."

{¶ 18} As to Schoen's role in the overall building process, Matt explained: "We are essentially like a main contractor. We subcontract out like all the work for the construction." Matt stated that Schoen utilizes approximately 12 subcontractors during the building process, and generally selects the same subcontractors on every building project.

{¶ 19} Matt explained that Schoen trusts its subcontractors as experienced professionals who know how to complete the work they are hired to do. As such, according to Matt: "It's not like I have to babysit them, make sure they're going to hang the drywall correctly or run the correct wiring or whatever it is. I know from experience that they are doing things that they need to be doing how they need to do it." Matt maintained that Schoen was not the sole decisionmaker as to whether or not to put up a guardrail along the ledge from which appellant fell. However, he later testified that Schoen, as the general contractor, would ultimately decide whether or not to put up the guardrail.

{¶ 20} During his deposition, Matt was asked to examine several photographs of the home that were taken during an earlier stage of the construction process. One of the photographs depicts the unguarded ledge off of which appellant fell. Referring to that photograph, appellant's trial counsel asked Matt whether the image depicted the condition of the ledge on the day appellant fell. Matt responded in the negative, and

7.

indicated his belief that Schoen "would have had like a guardrail up on that right side."

Thereafter, the following colloquy took place:

Q. Why would you believe that? Why would you need to have a guardrail up?

A. We don't need to. It's more so that like – maybe like a year prior our insulators started asking us to have them up on our job sites if we could when they came in to start insulating. So when this picture was taken – I take these pictures the day I do the rough structure inspection with the inspector. And so I would have taken these pictures, then had our inspection with the inspector, had like a laundry list of items for our framing carpenter to take care of. When he would come back, that's when – if he doesn't have a handrail on, at that point of the build, that's when I would also say to him to put the rails up when he's correcting his items on the inspection list.

Q. Okay. Having an unprotected edge like this, without a handrail, would be a hazard, true?

A. So that's kind of a tricky question. Yes, it could be hazardous, but the entire job site is also a hazard in itself. It's not like this is a house that somebody's living in and all of a sudden we're cutting out their wall and saying good luck to you. This is an evolving project that has thousands of ways that anybody could get hurt in one of these houses if they aren't aware

8.

of – completely 100 percent aware of their surroundings. That's kind of how I look at it.

\* \* \*

Q. Okay. So you were at this house at least the day before February 12th, correct?

A. To the best of my knowledge, yeah.

Q. Was there a railing on the edge of this landing leading into the foyer?

A. To the best of my knowledge.

{¶ 21} Subsequently, Matt was asked for an explanation as to how appellant could have fallen if a guardrail was installed as he suspected. Matt speculated that Tammarine and appellant must have removed the guardrail in order to maneuver the drywall around the corner from the walkway into an adjacent room, leaving the ledge unprotected at the time of the fall. He explained that "whatever railing would have been there they had to take down to do their job, [Tammarine] and [St. Clair]."

{¶ 22} According to Matt, drywallers routinely removed temporary guardrails at Schoen's construction sites. Matt stated: "What would happen from time to time is in order to hang the drywall, the drywall hangers ultimately have to take the guardrail down." Indeed, Matt testified that drywallers removed guardrails on "every house" in order to give them better access to complete their work.

{¶ 23} Matt further testified that he visited the construction site the day after appellant fell, and he "vaguely remember[ed]" seeing a guardrail lying on the floor. He insisted: "I had our carpenter put the guardrail up, so I know it was at the house."

9.

However, Matt later acknowledged: "I can't say 100 percent certain that I saw the railing up there."

{¶ 24} In addition to maintaining that a temporary guardrail was installed prior to appellant's fall, Matt testified that Schoen would not hesitate to install such a guardrail when asked by its subcontractors to do so. Further, Matt indicated that "there was always material laying around that if somebody felt that strongly about it, I would want – like I would expect that they would either say I am not working in this house without it or I am going to go and make one myself and charge the builder because I'm making it and I feel I need to do this." Ultimately, Matt explained that Schoen had its framing carpenter install guardrails, not because they were legally required to do so, but as "a gesture towards the subcontractors that ask for it," and "before [Tammarine] or before the insulators started, the railing would have been up in place." Matt confirmed that he did not receive any complaints from Schoen's subcontractors regarding the lack of a temporary guardrail along the ledge from which appellant fell prior to the fall.

{¶ 25} Aaron Schoen was the third witness to be deposed in this case. As the owner of Schoen, Aaron's responsibilities include monitoring the subcontractors used by Schoen and conducting weekly visits to the homes as they are being built. During his deposition, Aaron testified that Schoen is a custom homebuilder and functions as the general contractor whose responsibility it is to "select the subcontractors, bid out the house, and ultimately deliver the finished product." He agreed that Schoen has the authority to direct the operations of subcontractors at home construction sites, and that

10.

the subcontractors' authority at the sites is limited to their particular scope of work. Aaron further agreed that drywallers were not authorized to erect their own railing on the ledge where appellant fell. However, he stated that unprotected edges on the second floor of home construction sites was typical and do not require a temporary railing.

{¶ 26} Aaron recounted a conversation he had with Tammarine, during which he asked Tammarine if he recalled whether there was a guardrail installed along the ledge where appellant fell prior to the fall. According to Aaron, Tammarine "said he wasn't sure, but if there was one, he would have taken it down anyway because he would need to in order to hang drywall." Later in his deposition, Aaron acknowledged that he could not recall personally seeing a temporary guardrail installed at the site prior to the fall.

{¶ 27} Justin St. Clair was the fourth witness to provide deposition testimony in this case. Schoen routinely uses St. Clair as a drywall subcontractor on its home construction projects. Schoen hired St. Clair to install the drywall at the Fry home. Due to the large size of the Fry home, St. Clair hired Tammarine as a subcontractor to assist him on the project by hanging the drywall. Once Tammarine finished hanging the drywall, St. Clair came in to finish the project.

{¶ 28} According to St. Clair, Schoen does not provide daily oversight or direction of his work as a drywall subcontractor. He stated that he supplies his own tools at job sites, and he confirmed that Tammarine also supplies his own tools when working as St. Clair's subcontractor. St. Clair does not direct Tammarine's work or set Tammarine's work schedule. In short, St. Clair agreed that he and Tammarine are responsible for the

11.

means and methods they use to accomplish their work and are responsible for their own safety while performing that work.

{¶ 29} At his deposition, St. Clair testified that he knew appellant through appellant's affiliation with Tammarine. However, St. Clair stated that he has never worked alongside appellant or paid appellant directly for any of the work appellant has performed.

{¶ 30} Prior to beginning his drywall work on the Fry home, St. Clair conducted a walk through of the property in order to estimate the amount of work involved. He could not recall observing that the ledge from which appellant fell was unprotected at the time of his walkthrough. St. Clair testified that such a condition was typical and would not have concerned him. Referring to a temporary guardrail, St. Clair stated: "If I wanted one, I could install one myself." He further explained that if he wanted to have a temporary guardrail, he "could put one up" and "wouldn't need authority" to do so. However, St. Clair later acknowledged that he would call Schoen and ask for permission before installing a temporary guardrail.

{¶ 31} St. Clair confirmed that he had no discussions with anyone about the unprotected ledge at the Fry home prior to the fall. He testified that he has never asked Schoen to install a temporary guardrail at any construction site. He also indicated that Tammarine has never asked him to install such a guardrail. Moreover, St. Clair indicated that anytime he asked Schoen to do something for him, "they would get it done."

12.

{¶ 32} St. Clair testified that "there [have] been times" when he has had to remove temporary guardrails to allow access to the area where he needs to install drywall. St. Clair was shown a picture of the balcony area from which appellant fell and asked whether a temporary railing on the balcony edge would have to be removed in order to install drywall. St. Clair responded in the affirmative.

{¶ 33} In addition to the foregoing witnesses, appellant was also deposed in this case. According to appellant, he first began working in the construction industry in 1998. For the first 12 years of his construction career, appellant worked for his uncle as a framing carpenter. In addition to framing, appellant has also performed construction work as a roofer and has installed vinyl siding on homes.

{¶ 34} As a framer, appellant installed temporary guardrails on two-story homes. He testified that "[i]t was kind of a – I can't recall exactly who directed me. That's what we did as soon as we got to that level. * * * It's just a common practice."

{¶ 35} In February 2018, appellant began working exclusively with Tammarine. The parties have never had a written agreement governing their relationship, and appellant did not fill out an employment application prior to working with Tammarine. Further, appellant testified that he was free to turn down any work Tammarine offered him. Tammarine paid appellant in cash. Notwithstanding the flexibility of this arrangement, appellant believed that he was Tammarine's employee, not an independent contractor.

13.

{¶ 36} When he first began working with Tammarine, appellant had a conversation with Tammarine about work safety. Appellant testified that he discussed fall protection during this conversation. When asked what that conversation entailed, appellant responded: "Again, the same stuff that you always say. Just be aware of your surroundings. Nothing worth getting hurt for. So if you don't feel safe doing something, don't do it and find a safer way."

{¶ 37} As to the arrangement among the various parties working on the Fry home, appellant understood Schoen hired St. Clair to install the drywall. Thereafter, St. Clair hired Tammarine to hang the drywall in preparation for St. Clair to finish the drywall, and Tammerine hired appellant to assist in the hanging of the drywall.

{¶ 38} On the day of the fall, appellant arrived at the Fry home expecting to hang drywall on all of the ceilings. He and Tammarine began by taking their tools to the second floor of the home, which required "five or six" trips to and from their vehicle. Appellant could not recall whether he observed the open balcony during these trips, but he stated that he "never walked by that exact area until my fall. I came up the stairs into the elevated room and back down."

{¶ 39} Upon retrieval of the tools, appellant and Tammarine began to transport the sheets of drywall to their intended locations on the second floor of the Fry home. As they were doing so, appellant fell off the open balcony, which he stated he could not see because the drywall was impeding his vision as he was carrying it. Appellant acknowledged that there were no representatives from Schoen at the Fry home directing

14.

his work at the time of his fall. Instead, appellant testified that Tammarine was the one directing his work.

{¶ 40} Appellant explained the events leading up to his fall as follows:

So when we're walking, * * * [Tammarine] has to kind of turn to the left so that we can swing [the drywall sheet] around to try to get it up into the bonus room. So as [Tammarine] was turning to the left, * * * pressed up against that right hand wall, the hallway, with drywall against this wall and me on the inside and turning, trying to turn around the corner. So that when my end of the drywall cleared the corner, since we were turning to that left, as soon as we cleared the corner, the drywall kind of sprang on us because we were turning the corner and pulled me right off. There would normally be a temporary 2-by-4 right there. For open banisters, there's always temporary – there's temporary stuff to board that off.

{¶ 41} Near the end of his deposition, appellant was asked whether anyone at the Fry home told him that he could not install a temporary guardrail on the open balcony from which he fell. Appellant responded in the negative. Further, appellant acknowledged that Schoen did not direct his work on the day of the fall.

{¶ 42} After the foregoing witnesses were deposed and discovery concluded, on May 31, 2022, Schoen filed a motion for summary judgment. In its motion, Schoen argued that it was entitled to summary judgment on appellant's claims, because appellant was an independent contractor and thus it owed no duty to appellant to maintain a safe

15.

workplace since it did not actively participate in appellant's drywalling activities. Further, Schoen argued that the unprotected ledge on the balcony was an open and obvious danger, obviating any duty it may otherwise have owed appellant. Finally, Schoen contended that the OSHA regulations upon which appellant's negligence per se claim was based are inapplicable, because appellant was an independent contractor, not Schoen's employee.

{¶ 43} On June 28, 2022, appellant filed his memorandum in opposition to Schoen's motion for summary judgment. In his memorandum, appellant asserted that neither he nor Tammarine noticed the missing guardrail on the balcony, but even if they did, "they would not have had the authority to do anything about it." Appellant argued that Schoen had exclusive control over the premises and sole authority to erect or remove a safety guardrail at the Fry home. Therefore, appellant argued that Schoen actively participated in his drywalling work and owed him a duty of care to ensure that the site was safe, which it breached by failing to install a safety guardrail along the edge of the balcony. Moreover, appellant contended that the open and obvious doctrine was unavailable to Schoen because Schoen did not own or occupy the Fry home and attendant circumstances prevented him from observing the unprotecting edge prior to the fall.

{¶ 44} In support of his memorandum in opposition to Schoen's motion for summary judgment, appellant attached an affidavit from Jon Pina, an expert in construction practices and industry standards. In the affidavit and expert report incorporated therein by reference, Pina stated that residential construction standards and

OSHA regulations require a temporary guardrail of at least 39 inches in height over a second story unprotected ledge with a fall hazard of six feet or greater. Based upon his review of the deposition testimony produced by the parties during discovery, Pina opined that Schoen "maintained control over the unguarded floor opening and was the only entity with the authority to install temporary railing or otherwise correct the unguarded ledge." Thus, Pina found that Schoen "had a duty to install a temporary railing on the unguarded ledge and breached that duty by failing to do so."

{¶ 45} On July 13, 2022, Schoen filed its reply in support of its motion for summary judgment, reiterating its argument that it did not actively participate in appellant's drywalling work, did not violate OSHA regulations, and was entitled to rely upon the open and obvious as a residential builder of a home still under construction, and thus "occupied" by the builder.

{¶ 46} Upon consideration of the parties' arguments, the trial court issued its decision on Schoen's motion for summary judgment on August 25, 2022. In its decision, the trial court found no evidence to support appellant's negligence per se claim after concluding that OSHA regulations do not create a duty owed to appellant which could give rise to a civil action and noting that appellant failed to articulate any other statutory basis for negligence per se in this case.

{¶ 47} The court also determined that appellant's negligence claim against Schoen failed as a matter of law because Schoen did not owe appellant any duty to ensure a safe workplace. The court recognized that appellant was hired as an independent contractor to

17.

perform inherently dangerous work and found that Schoen did not actively participate, other than in a supervisory role, in appellant's drywalling work. Finding that Schoen was entitled to judgment as a matter of law on appellant's claims for negligence per se and negligence, the trial court granted Schoen's motion for summary judgment and entered judgment in Schoen's favor.

{¶ 48} Thereafter, on September 12, 2022, appellant filed his timely notice of appeal.

### B. Assignment of Error

{¶ 49} On appeal, appellant assigns the following error for our review:

The Trial Court erred in granting Summary Judgment for

Defendants/Appellees.

{¶ 50} While appellant's assignment of error is framed as a challenge to the trial court's grant of summary judgment to "Defendants/Appellees," the arguments he raises in his brief are directed exclusively at the trial court's judgment in favor of Schoen. Therefore, our analysis in this appeal will be limited to whether the trial court properly granted summary judgment to Schoen.

18.

## II. Analysis

**{¶ 51}** In his sole assignment of error, appellant argues that the trial court erred in granting Schoen's motion for summary judgment and dismissing his negligence claim against Schoen.[2]

### A. Standard of Review

**{¶ 52}** We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

### B. Relevant Law

**{¶ 53}** In order to prove Schoen's negligence, appellant must show: (1) the existence of a legal duty, (2) Schoen's breach of that duty, and (3) injury that is the proximate cause of Schoen's breach. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d

---

[2] Appellant does not challenge the trial court's dismissal of his claim for negligence per se. Therefore, we will not address that claim.

266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22, citing *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

{¶ 54} The primary issue in this appeal is whether Schoen had a legal duty to install a temporary guardrail on the second story balcony area of the Fry home in order to protect subcontractors like appellant from fall hazards. Since Schoen was the moving party, we must determine whether the evidence in the record, when viewed in a light most favorable to appellant, establishes that Schoen lacked any such duty toward appellant. For the following reasons, we hold that it does not, and thus find that the trial court erred in granting summary judgment to Schoen in this case.

{¶ 55} "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co.*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989). "[T]he existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace* at ¶ 23.

{¶ 56} The relationship between Schoen and appellant is one of a general contractor to subcontractor or employee of a subcontractor.[3] Ordinarily, Ohio law

---

[3] During his deposition, appellant testified that he considered himself to be Tammarine's employee. However, Tammarine insisted that appellant was himself a subcontractor. The same legal principles will apply irrespective of appellant's status as Tammarine's

20.

imposes no duty upon a general contractor to render a workplace safe for its subcontractors who are engaged in inherently dangerous work. *Rembowski v. Rudolph/Libbe Inc.*, 2020-Ohio-2864, 154 N.E.3d 564, ¶ 22 (6th Dist.), citing *Morris v. Collier Construction*, 5th Dist. Stark No. 218CA00167, 2019-Ohio-3946, ¶ 14, and *Frost v. Dayton Power & Light Co.*, 138 Ohio App.3d 182, 190, 740 N.E.2d 734 (4th Dist.2000). "A construction site is an inherently dangerous place and a subcontractor who works at a construction site engages in inherently dangerous work." *Id*. at ¶ 23, citing *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 478, 650 N.E.2d 1352 (1995), fn. 4.

{¶ 57} However, the general rule articulated above is not absolute. Indeed, the Ohio Supreme Court articulated an exception to the general rule 40 years ago when it stated:

> One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor.

---

employee or independent subcontractor. Therefore, we need not decide this dispute in order to resolve the issue before us.

*Hirschbach v. Cincinnati Gas & Elec. Co.*, 6 Ohio St.3d 206, 452 N.E.2d 326 (1983), syllabus.

{¶ 58} The Ohio Supreme Court has refined this exception on several occasions since *Hirschbach* was decided. First, the court limited the exception in *Cafferkey v. Turner Const. Co.*, 21 Ohio St.3d 110, 488 N.E.2d 189 (1986), as follows: "A general contractor who has not *actively participated* in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." (Emphasis added). *Id*. at 113.[4] Second, the court expressly defined the phrase "actively participated" in a decision it issued nine years after *Cafferkey*, and stated: "Accordingly, we hold that for purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury." *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 337, 650 N.E.2d 416 (1995). The "entire point of the *Bond* decision was to refine [the court's] holding in *Cafferkey* and to cut a definitive line between those situations in which a general contractor can be said to have 'actively participated' in the work of an

_____

[4] The cases following *Cafferkey* use the terms "actively participated" and "actually participates" interchangeably and synonymously. The Ohio Supreme Court has not attempted to distinguish these terms. For the sake of consistency, we will utilize the phrase "actively participated" and its variants throughout this decision.

22.

independent subcontractor, and those situations in which a general contractor merely exercises a general supervisory role over the construction project." *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 640, 693 N.E.2d 233 (1998).

{¶ 59} Third, the court created another means for relief under its active participation exception when it issued its decision in *Sopkovich* three years after *Bond* was decided. There, the court stated that active participation will be found "where a property owner either directs or exercises control over the work activities of the independent contractor's employees, *or where the owner retains or exercises control over a critical variable in the workplace*." (Emphasis added.) *Id.* at 643.

{¶ 60} Since Edison was both the defendant and the property owner in *Sopkovich*, the language employed in that decision was limited to "property owners." Nonetheless, "the Ohio Supreme Court has previously held that the same legal test may be used for general contractors as for property owners when determining whether the entity owes a duty." *Paul v. Grae-Con Const., Inc.*, 7th Dist. Jefferson No. 97 JE 49, 1999 WL 689246, *4 (Sep. 2, 1999), citing *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 478, 650 N.E.2d 1352 (1995). Indeed, most courts, including this court, have applied *Sopkovich* to both property owners and general contractors. *See Rembowski v. Rudolph/Libbe Inc.*, 2020-Ohio-2864, 154 N.E.3d 564 (6th Dist.) (applying the critical variable language from *Sopkovich* to a claim brought by an ironworker against a general contractor); *Morris v. Collier Construction*, 5th Dist. Stark No. 2018CA00167, 2019-Ohio-3946 (finding no evidence that the general contractor exercised control over a

23.

critical aspect of the working environment); *but see Pinkerton v. J & H Reinforcing*, 4th Dist., Scioto Nos. 10CA3386, 10CA3388, 2012-Ohio-1606, ¶ 35 ("In fact, throughout *Sopkovich*, the Supreme Court of Ohio expressly limited its holding to property owners."). The parties do not dispute that *Sopkovich* applies to this case, and we will proceed accordingly.

{¶ 61} In sum, the foregoing case law establishes that a general contractor like Schoen has no duty to render the workplace safe for its independent subcontractor who is engaged in inherently dangerous work unless it actively participates in, rather than merely supervises, the subcontractor's work. Such active participation will be found where the general contractor either (1) directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, or (2) retains or exercises control over a critical variable in the workplace. *Clark v. Ohio Dept. of Transp.*, 163 Ohio St.3d 1443, 2021-Ohio-1925, 168 N.E.3d 1204, ¶ 9.

### C. Legal Analysis

{¶ 62} At the outset of our analysis, we note that there is no evidence that Schoen directed appellant's activity or gave or denied permission for the installation of a temporary guardrail at the Fry home. During his deposition, appellant acknowledged that Schoen did not direct his work on the day of the fall. Indeed, the undisputed testimony provided by appellant and Tammarine establish that the two men arrived at the Fry home, unloaded their tools, and began their work without the presence of any Schoen employees. Appellant's work was entirely self-directed. Further, appellant conceded that

24.

he was never told by a Schoen employee that he could not install a temporary guardrail on the open balcony from which he fell. Indeed, the record is devoid of any evidence that Schoen's employees ever had any contact with appellant at the Fry home prior to his fall.

{¶ 63} Furthermore, there is no evidence that Schoen directed appellant's drywalling work or gave or denied permission for the installation of a temporary guardrail at the Fry home. Thus, Schoen may only be found to have actively participated in appellant's work, thereby triggering a duty, if it retained or exercised control over a critical variable in the workplace.

{¶ 64} Appellant, in his brief to this court, focuses his argument on the critical variable prong of the active participation exception, and argues that Schoen actively participated in his work by exclusively controlling a critical variable in the working environment at the Fry home, namely the installation of guardrails. Appellant reasons that Schoen had a duty to render the Fry home site safe by installing a temporary guardrail on the open balcony area from which he fell. Schoen does not dispute that the installation of guardrails was a critical variable at the Fry home. However, Schoen argues that it owes no duty to appellant because it did not exclusively control that variable.[5]

---

[5] Despite the fact that appellant does not claim in his brief that Schoen actively participated in this case by directing his work activities, Schoen raises this argument in its brief. Having already determined that there is no evidence that Schoen directed appellant's work at the Fry home, we need not address that issue further.

25.

{¶ 65} In support of his argument, appellant primarily relies upon *Sopkovich*, but also cites *Cefaratti v. Mason Structural Steel Co.*, 136 Ohio App.3d 363, 736 N.E.2d 913 (8th Dist.1999), and *Bacha v. Sam Pitzulo Homes & Remodeling, LLC*, 7th Dist. Mahoning No. 17 MA 0097, 2019-Ohio-878.

{¶ 66} In *Sopkovich*, Ohio Edison Company hired an independent contractor, Morakis Sons Industrial Painting Company, Inc., to paint steel structures at Edison's Masury, Ohio high voltage electric transmission substation. It was not feasible for Edison to shut off the entire flow of electricity at the substation while the painting was underway, so Edison had to de-energize certain areas within the substation to allow those areas to be safely painted. Consequently, an Edison employee informed a Morakis representative each day which areas were energized and which were not. The Morakis representative then passed along the information to Morakis employees who were painting at the facility. Notably, only Edison had control over the activation and deactivation of electrical circuits that was necessary in order to de-energize portions of the substation.

{¶ 67} While painting at the substation, one of Morakis's employees, Michael Lexie, came into contact with an energized area and sustained severe injuries. Consequently, Lexie filed a complaint against Edison, alleging negligence on the part of Edison for "failing to (1) provide a safe place of employment, (2) eliminate known hazards, (3) 'adequately supervise the work activities,' (4) install proper safety devices,

26.

and (5) de-energize the electrical lines involved in the accident." *Sopkovich* at 631. The trial court granted summary judgment in Edison's favor and Lexie appealed.

{¶ 68} The court of appeals agreed with the trial court that Edison did not direct or control the activities of Morakis's painting crew, but found that Edison did control the deactivation of specific electrical lines in the substation, thereby making Lexie's safety dependent upon Edison's proper handling of its deactivation responsibilities and communication thereof. Therefore, the court of appeals found that a genuine issue of material fact existed as to whether Edison created a duty of care by retaining and exerting control over a critical aspect of Lexie's working environment.

{¶ 69} After reviewing its prior decisions involving the duties and responsibilities owed by one who hires an independent contractor to perform inherently dangerous work, the court held that "active participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, or where the owner retains or exercises control over a critical variable in the workplace." *Sopkovich* at 635. The court applied this standard and found that Edison did not direct or control Lexie's work activities, but did retain exclusive control over a critical variable, namely the de-activation of specific electrical conductors in the work area. *Id.* at 643.

{¶ 70} One year after *Sopkovich* was decided, the Eighth District Court of Appeals issued its decision in *Cefaratti*. There, an employee of a plumbing subcontractor, American Piping, was injured when he fell in an open stairwell. The employee

27.

commenced a negligence action against the general contractor of the construction site, which had originally installed a guardrail on the stairway but later removed it.

{¶ 71} On review of the trial court's grant of summary judgment in favor of the general contractor, the Eighth District reviewed *Sopkovich* and distinguished "work-activities cases" like *Cafferkey* and *Bond* from "work environment [cases]" like *Sopkovich*. *Cefaratti*, 136 Ohio App.3d at 366, 736 N.E.2d 913. The court found that the general contractor did not actively participate in the employee's work activities, but that there was a genuine issue of material fact as to whether the general contractor was responsible for the absence of the guardrail and whether the absence of the guardrail constituted a critical variable in the workplace. *Id.* The court noted the existence of record evidence suggesting that the general contractor retained control over the staircase and that this was a critical variable in the workplace. *Id.* Accordingly, the court reversed the trial court's grant of summary judgment to the general contractor. *Id.*

{¶ 72} In 2019, the Seventh District issued its decision in *Bacha*. In that case, an electrical subcontractor's employee was injured at a home remodel site after falling through an opening in the floor after the general contractors' employees removed floorboards in the area in which the employee was working. The subcontractor brought suit against the general contractors, alleging claims of negligence and negligence per se.

{¶ 73} Following discovery, the general contractors moved for summary judgment, arguing they had no duty to protect the subcontractor's employee from hazards that are inherently present in construction work. The trial court granted the general

28.

contractor's motion for summary judgment, finding that the general contractors did not direct or control the subcontractor's employee or participate in the employee's work on the date of his injury.

{¶ 74} On appeal, the Seventh District determined that the general contractors' removal of the floorboards constituted a critical variable that gave rise to a duty on the part of the general contractors. *Bacha*, 7th Dist. Mahoning No. 17 MA 0097, 2019-Ohio-878, at ¶ 30. Consequently, the court reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at ¶ 44.

{¶ 75} Application of *Sopkovich*, *Cefaratti*, and *Bacha* leads us to conclude that summary judgment in Schoen's favor was improper in this case. We begin our analysis by recognizing the distinction observed by the court in *Cefaratti* between work environment cases and work-activities cases. Since the issue in this case concerns the installation of a safety guardrail at the Fry home site, this is a work environment case, not a work-activities case. With that frame in mind, we turn to the application of the case authority bearing upon our analysis.

{¶ 76} *Cefaratii* supports appellant's claim, which Schoen does not contest, that the installation of a temporary guardrail is a critical variable. Further, all three cases establish that duty arising out of an owner's or general contractor's active participation hinges upon whether the owner/contractor exercised control over the critical variable in the workplace. *See also Strother v. Frank Novak & Sons, Inc.*, 8th Dist. Cuyahoga Nos. 76306, 76385, 2000 WL 1036236, *4 (Jul. 27, 2000), citing *Cefaratti* ("In these worksite

29.

injury cases involving independent contractors, the issue is who controls the danger or who controls the safety procedures at the project.").  In each of these cases, such control was obvious.  In *Sopkovich*, Edison was clearly in exclusive control of the flow of electricity at its substation.  In *Cefaratti* and *Bocha*, the contractors were actively involved in removing guardrails and floorboards, respectively.  The present case is more difficult because there is no evidence that Schoen removed a temporary guardrail that it had previously installed.  Nonetheless, there is some evidence that Schoen exercised exclusive control over the critical variable of installing guardrails at the Fry home, and also evidence that Tammarine and appellant could install and remove their own temporary guardrails to protect themselves while they worked.  Indeed, there is some evidence in the record to support the notion that a temporary railing was already in place when appellant arrived at the Fry home, and appellant and/or Tammarine removed it in order to complete their work.

{¶ 77} Admittedly, the record contains conflicting evidence on this issue.  At times, the deposition witnesses testified as if Schoen exercised no authority over the workplace and appellant could have constructed a temporary guardrail without asking for Schoen's permission.  For example, Matt testified that Schoen's role in the construction process merely involved overseeing the project, scheduling subcontractors and material deliveries, and responding to questions and concerns from subcontractors and homeowners.  According to St. Clair, Schoen did not oversee or direct his work as a drywaller.  He agreed that drywallers subcontracted by Schoen are responsible for the

30.

means and methods they use to accomplish their work and are responsible for their own safety while performing that work. Indeed, St. Clair testified that "there [have] been times" when he has had to remove temporary guardrails and, when shown a picture of the balcony area from which appellant fell, he agreed that a temporary railing on the balcony edge would have to be removed in order to install drywall. Further, Tammarine testified that Schoen did not always have a supervisor onsite at the Fry home, and no Schoen employee was at the site at the time of appellant's fall.

{¶ 78} Matt maintained that Schoen was not the sole decisionmaker as to whether or not to put up a guardrail along the ledge from which appellant fell. Matt also testified that drywallers have the authority to remove temporary guardrails if necessary to complete their work at Schoen's constructions sites. Matt stated that such removal was common, even going so far as to state that drywallers had to remove guardrails at every home construction site. Matt further testified that subcontractors routinely had extra building material lying around the construction site and could construct a guardrail themselves, and then charge Schoen for the work, if they felt as though a guardrail was necessary to ensure their safety. Similarly, St. Clair stated: "If I wanted [a temporary guardrail], I could install one myself." He further explained that if he wanted to have a temporary guardrail, he "could put one up" and "wouldn't need authority" to do so.

{¶ 79} The foregoing testimony, taken together, supports the idea that Schoen merely supervised the Fry home construction project, and did not control the workplace or the installation of guardrails therein, thereby distinguishing this case from *Sopkovich*,

31.

*Cefaratti*, and *Bacha*. However, deposition testimony from Aaron and Matt strongly suggest that Schoen actively controlled the workplace and had the sole authority to determine whether to construct a temporary safety guardrail. This testimony suggests that Schoen actively exercised exclusive control over the installation of guardrails.

{¶ 80} Aaron testified that Schoen had the authority to direct the operations of the subcontractors at the Fry home, and that drywallers were not authorized to erect their own railing on the ledge where appellant fell. Although Tammarine could not identify whose responsibility it was to erect a temporary guardrail at the Fry home, he stated that the balcony area from which appellant fell was under Schoen's control. Moreover, Matt testified that Schoen, as the general contractor, would ultimately decide whether or not to put up a guardrail. He further testified that Schoen had its framing carpenter install such guardrails at every home construction site as a routine practice. Matt was so certain that this practice was followed at the Fry home that he maintained that appellant's fall could only be explained if appellant and Tammarine removed the temporary guardrail before beginning their drywalling work. St. Clair, despite initially stating that he could install his own temporary guardrail whenever he felt he needed one, later acknowledged that he would call Schoen and ask for permission before installing a temporary guardrail.

{¶ 81} Taken together and construed in a light most favorable to appellant, the foregoing conflicting testimony manifests questions of material fact as to whether Schoen actively participated in this case by exercising exclusive control over a critical variable in the Fry home workplace, thereby giving rise to a duty owed by Schoen to appellant under

32.

*Sopkovich*.  Consequently, the trial court erred in granting summary judgment to Schoen on appellant's negligence claim.

{¶ 82} Accordingly, we find appellant's sole assignment of error well-taken.

### III.  Conclusion

{¶ 83} For the foregoing reasons, the judgment of the Wood County Court of Common Pleas is reversed, and this matter is remanded to the trial court for further proceedings consistent with this decision.  Schoen is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed
And remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.       _____
JUDGE

Gene A. Zmuda, J.

      _____

Myron C. Duhart, P.J.       JUDGE
CONCUR.

      _____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.