OPINION
{¶ 1} Plaintiffs-appellants, Bachu and Geeta Solanki, appeal from a *Page 2 
Jefferson County Common Pleas Court judgment granting summary judgment in favor of defendants-appellees, Dr. Atul and Pallavi Shah and defendants-appellees, Doug Freshwater Contracting, Inc., Freshwater Homes, Doug Freshwater, Jr. d/b/a Doug Freshwater Jr. Construction, and Doug Freshwater, Sr.
 {¶ 2} Bachu Solanki and Dr. Shah were coworkers and friends. The Shahs were building a new home and asked Solanki to install a home stereo and intercom system in the house. While in the house working on the wiring, Solanki fell from a second-floor balcony area. The house was still under construction at the time and there was no railing to guard the balcony. According to Solanki, he stepped on a loose board, lost his balance, and fell. Solanki landed on his feet and severely fractured both of his heels requiring hospitalization and ongoing treatment.
 {¶ 3} Appellants filed suit against the Shahs and the Freshwaters asserting claims for negligence and loss of consortium. The Shahs and the Freshwaters filed counterclaims against each other for indemnification and contribution.
 {¶ 4} The Shahs and the Freshwaters filed motions for summary judgment. The trial court granted both motions. It found that Solanki was an independent contractor, the home under construction was an inherently dangerous place, Solanki's task of running and mapping wires was inherently dangerous because of where he was doing it, and the hazard of a second floor deck with no railing on a construction site was open and obvious.
 {¶ 5} Appellants filed a timely notice of appeal on September 25, 2006.
 {¶ 6} Appellants raise two assignments of error alleging that the trial court erred in granting summary judgment to the Freshwaters and the Shahs.
 {¶ 7} In reviewing an award of summary judgment, appellate courts must apply a de novo standard of review. Cole v. American Indus. ResourcesCorp. (1998), 128 Ohio App.3d 546, 552, 715 N .E .2d 1179. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper. Civ.R. 56(C) provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly *Page 3 
in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. State exrel. Parsons v. Flemming (1994), 68 Ohio St.3d 509, 511,628 N.E.2d 1377. A "material fact" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon Assoc, Inc. (1995),104 Ohio App.3d 598, 603, 662 N.E.2d 1088, citing Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202.
 {¶ 8} Here, appellants asserted claims of negligence against both sets of appellees. A negligence claim requires the plaintiff to prove: (1) duty; (2) breach of duty; (3) causation; and (4) damages. Anderson v.St. Francis-St. George Hosp., Inc. (1996), 77 Ohio St.3d 82, 84,671 N.E.2d 225.
 {¶ 9} With the summary judgment standard of review and the required negligence elements in mind, we move on to analyze appellants' alleged errors.
 {¶ 10} Appellants' first assignment of error states:
 {¶ 11} "THE TRIAL COURT ERRED IN GRANTING THE FRESHWATER DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT."
 {¶ 12} Appellants first argue that the Freshwaters failed to comply with certain provisions in Ohio Admin. Code 4123:1-3-01 and similar Occupational Safety and Health Administration (OSHA) regulations.
 {¶ 13} Ohio Admin. Code 4123:1-3-04 is a workers' compensation regulatory section dealing with construction safety of such things as railings and open-sided platforms. It applies to "temporary conditions where there is danger of employees or material falling through floor, roof or wall openings or from stairways or runways." Ohio Admin. Code4123:1-3-04(A).
 {¶ 14} Ohio Admin. Code 4123:1-3-04(E)(1) provides in part:
 {¶ 15} "Standard guard railing shall be constructed as a substantial barrier, securely fastened in place * * * to protect openings * * * and unless the space between the top rail and the working level is covered with substantial material, an intermediate rail."
 {¶ 16} Additionally, Ohio Admin. Code 4123:1-3-04(H)(1)(a) provides: *Page 4 
 {¶ 17} "Standard guard railing and toeboards shall be provided on every open-sided floor or platform six feet or more above adjacent floor or ground level, except where there is entrance to a ramp, stairway or fixed ladder."
 {¶ 18} Appellants rely on the affidavit and report of architect Robert Stevens for support, which they attached to their response to summary judgment. Stevens stated that Solanki's fall was a direct result of the lack of fall protection on the work site, the Freshwaters had a duty to put fall protection in place, and the Freshwaters' failure to have fall protection was below the ordinary and reasonable standard of care.
 {¶ 19} Appellants analogize their case to Circelli v. KeenanConstr., 165 Ohio App.3d 494, 847 N.E.2d 39, 2006-Ohio-949. In that case, Truberry was the general contractor building a house. He subcontracted with Keenan and with Circelli. Keenan installed a temporary prefabricated staircase. While Circelli was walking down the prefabricated staircase, it collapsed and he was injured. Circelli sued Truberry and Keenan alleging (1) that Truberry had violated its duty to keep the construction premises safe and had either negligently installed the stairs or had caused them to be negligently installed and (2) that Keenan had negligently installed the staircase. The trial court granted summary judgment in favor of Keenan, finding that he owed Circelli no duty under R.C. 4101.11 and that even if Keenan owed Circelli a duty of ordinary care, the evidence was insufficient to create a genuine issue of material fact about whether Keenan had used less than ordinary care in installing the staircase. Circelli and Truberry appealed.
 {¶ 20} The Tenth District reversed, finding that Circelli presented evidence creating a genuine issue as to what is the appropriate standard of care required in installing a prefabricated staircase and whether Keenan, in fact, installed the staircase in accordance with that standard of care. The court further held that R.C. 4101.11 did not impose a duty on an independent contractor to a second independent contractor to keep its workplace safe unless the first independent contractor actively participated in or supervised the second independent contractor's *Page 6 
work. Id. at ¶ 10.
 {¶ 21} The court then held that Keenan did not owe Circelli an affirmative duty under R.C. 4101.11 because Keenan was an independent subcontractor who did not employ, contract with, supervise, or actively participate in Circelli's plumbing work. Id. at ¶ 11. However, the court found that Keenan owed Circelli a duty of ordinary care arising from his spatial relationship to Circelli on the construction site. Id.
 {¶ 22} Appellants further assert that Solanki was not engaged in inherently dangerous work, as the trial court found. They contend that where the hazard can be removed by the exercise of ordinary care by the one in control of the premises, then the hazard is not inherent to the work to be done. Appellants assert that Solanki's work was simply to coordinate the installation of an intercom system. They point out that at the time of Solanki's fall, he was simply walking from one bedroom to another to note the location of intercom wires before the drywall was hung. Appellants argue that at the very least, whether Solanki's work was inherently dangerous is an issue for a jury.
 {¶ 23} Appellants next argue that the Freshwaters owed Solanki a duty of care as a "frequenter" under R.C. 4101.11 and R.C. 4101.12.
 {¶ 24} R.C. 4101.11 provides in part: "Every employer * * * shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, * * * and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters."
 {¶ 25} R.C. 4101.12 provides in part:
 {¶ 26} "No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe."
 {¶ 27} A "frequenter" is "every person, other than an employee, who may go in or be in a place of employment under circumstances which render the person other *Page 6 
than a trespasser." R.C. 4121.01(A)(5). And a "place of employment" is "every place, * * * where either temporarily or permanently any industry, trade, or business is carried on, or where any process or operation, directly or indirectly related to any industry, trade, or business, is carried on and where any person is directly or indirectly employed." R.C. 4121.01(A)(1).
 {¶ 28} Under these provisions, appellants argue that the Freshwaters, as employers, owed Solanki a duty, as a frequenter, to use safeguards necessary to make the construction site safe for him and to protect his safety.
 {¶ 29} Appellants also point to Douglas Freshwater's deposition testimony, which they allege demonstrated that the Freshwaters took no steps to protect their workers or any visitors from the open second-floor balcony and that the Freshwaters were ignorant on the subject of regulations pertaining to the job.
 {¶ 30} The Freshwaters analogize their case to Bond v. HowardCorp. (1995), 72 Ohio St.3d 332, 650 N.E.2d 416. In that case, Howard was the general contractor building a movie theater. Howard subcontracted with Valentine to do the masonry work. Bond was Valentine's employee. While working on the project, Bond fell through an unguarded, second-floor opening for a stairwell that had not yet been installed and was seriously injured. Bond was aware that the opening existed and that it was unguarded. At the time of his fall, Bond was building a wall. Howard did not supervise or participate in the actual construction of the wall. Bond sued Howard alleging that Howard was negligent in performing its duties as a general contractor and in providing Bond with a safe place to work. Howard moved for summary judgment asserting that it did not owe a duty of care to Valentine's employees. The trial court granted the motion and Bond appealed.
 {¶ 31} The Ohio Supreme Court affirmed, holding:
 {¶ 32} "For purposes of establishing liability to the injured employee of an independent subcontractor, `actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a *Page 7 
general supervisory role over the project." Id. at the syllabus.
 {¶ 33} The Court found that Howard did not actively participate in Bond's work because it neither gave nor denied permission for the critical acts that led to his injuries — the placing of the materials Bond used near the opening. Id. at 336. The Court indicated that a construction site is an inherently dangerous setting. Id. Furthermore, it pointed out that Bond was aware that the materials for the wall were placed near the opening by a Valentine employee and that a railing had not been placed in front of the opening. Id.
 {¶ 34} Additionally, the Court found that although Howard gave "directives" to Bond, these directives were merely those of a general supervisor. Id. at 337. It found that these actions did not demonstrate that Howard actively participated in any action or decision that led to Bond's injuries. Id.
 {¶ 35} First, we must determine whether the Freshwaters owed a duty of care to Solanki. Whether one party owes a duty of care to another party in a negligence action is a question of law that the court must determine. Mussivand v. David (1989), 45 Ohio St.3d 314, 318,544 N.E.2d 265. A duty is possible here in one of two ways: (1) under the R.C. 4101 frequenter statutes; or (2) a common law duty of ordinary care.
 {¶ 36} The frequenter statutes impose an affirmative duty on an employer to keep its workplace in a reasonably safe condition for its employees and frequenters of its workplace. However, an independent contractor, "`who lacks a contractual relationship with a second independent contractor owes no affirmative duty beyond that of ordinary care to the employees of the second contractor, where the first contractor does not supervise or actively participate in the second contractor's work.'" Circelli, 165 Ohio App.3d at ¶ 10, quotingKucharski v. Natl. Engineering Contracting Co. (1994),69 Ohio St.3d 430, 633 N.E.2d 515, at the syllabus. Consequently, "even when two or more independent contractors are engaged in work on the same premises that does not implicate the frequenter statute, the first independent contractor owes a duty in prosecuting its work to use ordinary and reasonable care *Page 8 
not to cause injuries to the employees of the second contractor." Id.
 {¶ 37} In the present case, the Freshwaters were the general contractors on the Shah house. (A. Shah Dep. 102). Solanki was hired by the Shahs to install the home theater and intercom systems. (A. Shah Dep. 102-103). Solanki was not a subcontractor of the Freshwaters. (A. Shah Dep. 26-27, 102-103; Freshwater Dep. 8). Thus, the Freshwaters had no type of contractual relationship with Solanki. The Freshwaters did not supervise Solanki, nor did they participate in his work in installing the home theater or intercom systems. (Freshwater Dep. 29; Solanki Dep. 91-97). The Freshwaters and Solanki were simply engaged in work on the same premises. Thus, according to Circelli andKucharski, the frequenter statutes did not create a duty of care from the Freshwaters to Solanki.
 {¶ 38} But also according to Circelli and Kucharski, the Freshwaters would have still owed Solanki a common law duty to use ordinary, reasonable care in performing their work so as not to cause injury to Solanki.
 {¶ 39} The trial court found, however, that the Freshwaters owed Solanki no duty, in part, because he was engaged in inherently dangerous work.
 {¶ 40} "A general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." Cafferkey v. TurnerConst. Co. (1986), 21 Ohio St.3d 110, 488 N.E.2d 189, at the syllabus. In Cafferkey, two employees of a subcontractor died from injuries sustained in an explosion that occurred when they went down into a caisson hole to burn off a piece of casing that had caused a jam. When one of the employees struck his flint to light the torch, an explosion occurred. They undertook this task at the direction of their employer, Millgard. The general contractor, Turner, had no say in the decision and did not direct or interfere with Millgard's work. The Court held that because Millgard directed its own employees and Turner had no say in their work activities, Turner, as the general contractor, owed no duty to the Millgard employees. *Page 9 
 {¶ 41} The key fact in Cafferkey was that Turner did not actively participate in Millgard's work. However, another important factor the Court took into consideration was that the Millgard employees were engaged in inherently dangerous work.
 {¶ 42} In the present case, the Freshwaters did not actively participate in Solanki's work. (Freshwater Dep. 29; Solanki Dep. 91-97). The Freshwaters had nothing to do with the installation of the home theater or intercom systems. And the Freshwaters did not supervise Solanki. (Freshwater Dep. 29-30). Thus, the parties assert that we must look at whether, at the time of his fall, Solanki was engaged in "inherently dangerous work."
 {¶ 43} We should point out that in most of the cases dealing with the "inherently dangerous" test, one of two fact patterns exist: either (1) the subcontractor was injured while performing work he was hired to do by the general contractor and the subcontractor sued the general contractor; or (2) the independent contractor was injured while performing work he was hired to do by the property owner and the independent contractor sued the property owner. Here, the Freshwaters were the general contractor on the Shah house. Solanki was not a subcontractor of the Freshwaters. Thus, the Freshwaters and Solanki were simply two unrelated parties hired to work on the same premises.
 {¶ 44} The rationale behind the "inherently dangerous" cases is that if a property owner or general contractor hires an independent contractor or subcontractor to perform certain work, the property owner or general contractor may assume a duty to the worker to keep the work premises safe. However, if the property owner or general contractor hires the independent contractor or subcontractor to perform inherently dangerous work, then that duty is eliminated because of the intrinsic risk in the work, of which the independent contractor or subcontractor is aware and should guard against. This reasoning applies to the fact pattern at hand. While the Freshwaters did not owe Solanki a duty by way of hiring him to perform a job, as stated above, they did owe him a duty in performing their work to use "ordinary and reasonable care" so as to not cause him injuries. If, *Page 10 
however, Solanki was performing work that was inherently dangerous when he was injured, then the Freshwaters did not owe him a duty because he should have been aware of the dangers of his work and protected himself against them.
 {¶ 45} Generally, courts have held that whether work is inherently dangerous is a question of law for the court, rather than a jury, to decide. Poiry v. Certified Power, Inc., 6th Dist. No. L-05-1331,2006-Ohio-3183, at ¶ 14; Tackett v. Columbia Energy Group ServiceCorp. (Nov. 20, 2001), 10th Dist. No. 01AP-89; Sopkovich v. Ohio EdisonCo. (1998), 81 Ohio St.3d 628, 643, 693 N.E.2d 233. This is so because whether the work is inherently dangerous goes to whether a duty is owed, which is a question of law.
 {¶ 46} The trial court found that the construction site was an inherently dangerous place at the time the accident occurred. It reasoned: "This was a home under construction where tools, power cords, material and scrap could be anywhere. The work site was a second floor work site on a deck where the rail had not yet been installed. There is no doubt that this site offered many opportunities for injury at its height and at its level of completion." The court further found that Solanki's job was inherently dangerous, reasoning: "While running or mapping intercom wires may not be inherently dangerous in some circumstances it was inherently dangerous here. In order to do his job, Plaintiff was required to move about in an incomplete home, still under construction, where tools, power cords, materials and scrap could be anywhere and to work on a second floor deck where the rail had not yet been installed. Plaintiffs task under these circumstances was inherently dangerous because of where it was located."
 {¶ 47} The phrase "inherently dangerous" has been applied to situations where the nature of the work itself is inherently dangerous,Wellman v. East Ohio Gas Co. (1953), 160 Ohio St. 103, 113 N.E.2d 629
(laying gas lines to be attached to existing high pressure gas lines is inherently dangerous), and also where the work site is inherently dangerous, Bond, 72 Ohio St.3d 332 (construction site is inherently dangerous). *Page 12 
 {¶ 48} The Fourth District set out the following principles surrounding an "inherently dangerous" determination:
 {¶ 49} "[T]he performance of a task is inherently dangerous when the independent contractor recognizes or should recognize that a degree of danger surrounds the performance of the task for which he was engaged. In answering the foregoing question, courts should not limit the inquiry to the specific task being performed. Rather, courts also should consider the environment in which the task is performed. The owner or occupier of the premises will not be liable for an injury resulting from a danger inherent in a task when the injury was reasonably foreseeable to the independent contractor, i.e., the independent contractor knows or appreciates that degree of danger that `surrounds' the task's performance." Frost v. Dayton Power Light Co. (2000), 138 Ohio App.3d 182,198-99, 740 N.E.2d 734.
 {¶ 50} In Frost, the court applied the foregoing principles to a situation where a painter hired to paint newly installed pipes in a power plant was injured when he was struck in the head by a falling pipe. The court concluded that the painter's task of painting in a commercial, industrial setting where hard hats were required, involved inherent dangers of which he knew or should have known. Id. at 199. The court agreed with the painter's argument that painting generally is not dangerous. Id. However, it found that an independent contractor engaged to paint in an industrial environment should recognize that real or potential dangers exist and that the painter's injury was not beyond the realm of foreseeable risks given the industrial workplace environment. Id.
 {¶ 51} Appellant relies on Mersits v. Podojil Builders, Inc. (1989),64 Ohio App.3d 266, 581 N.E.2d 562. In that case, Mersits was hired by the general contractor to hang drywall. Mersits was injured when a seemingly assembled steel door jamb came apart and collapsed on him. The Eighth District found that Mersits' work was not inherently dangerous. It stated that, "while Mersits admitted that it is not uncommon to move items at the work site, this does not establish that the work was inherently dangerous or that he could reasonably expect to encounter the harm *Page 12 
sustained in the performance of his work." Id. at 269.
 {¶ 52} The Mersits opinion, however, did not address whether the construction site itself was inherently dangerous. And years after the Eighth District decided Mersits, the Ohio Supreme Court stated that a construction site is inherently dangerous. Bond, 72 Ohio St.3d at 336.
 {¶ 53} In the present case, Solanki was hired by the Shahs to install a home theater and intercom system. At the time of his fall, Solanki was walking down a hallway from one bedroom to the next in order to map the location of the speaker wires in the bedroom walls before the drywall was hung. (Solanki Dep. 98-99, 110). This work of mapping speaker wires for an intercom system is not, in and of itself, inherently dangerous work.
 {¶ 54} But we must also consider the premises on which Solanki was performing his work. This was a house under construction. The drywall was in the process of being hung. (Solanki Dep. 99-100). The railing on the second floor had not yet been installed. Solanki himself stated that this was a construction site and that construction was going on "all the time." (Solanki Dep. 109, 128). Thus, the Shah house was an active construction site. Therefore, Solanki's work was to map speaker wires for a home intercom system while on an active construction site.
 {¶ 55} Solanki had been to the Shah house seven or eight times prior to his fall. (Solanki Dep. 104). And he had been on the second floor three or four times. (Solanki Dep. 106). Additionally, Solanki had walked across the balcony numerous times before falling. (Solanki Dep. 132). Thus, he should have been well aware that there was no railing on the second floor balcony.
 {¶ 56} This situation is strikingly similar to the situation inBond, 72 Ohio St.3d 332. While building a wall, Bond fell through an unguarded, second-floor opening for a stairwell. Bond was aware that the opening existed and that it was unguarded. In addition to stating that a construction site is an inherently dangerous setting, the Ohio Supreme Court pointed out that Bond was aware that the materials for the wall were placed near the opening and that there was no railing in front of the opening. *Page 13 
Id. at 336. The Court affirmed summary judgment in favor of the defendant/general contractor finding that the defendant/general contractor did not owe a duty of care to Bond.
 {¶ 57} Given the Court's determination in Bond, along with the facts in this case, we conclude that Solanki was engaged in inherently dangerous work. While mapping speaker wires is not inherently dangerous, doing so on this particular active construction site was inherently dangerous. As Solanki himself stated, construction was going on "all the time." This construction gave rise to numerous dangers, making Solanki's work inherently dangerous.
 {¶ 58} Furthermore, Solanki urges us that to reach this conclusion would render the frequenter statutes and the Ohio Administrative Code's above quoted safety provisions meaningless. Solanki argues that we must apply these statutes and rules to conclude that the Freshwaters owed him a duty regardless of the fact that he was engaged in inherently dangerous work on an active construction site. However, both the frequenter statutes and the applicable Ohio Administrative regulations were in effect when the Ohio Supreme Court determined that a construction site is an inherently dangerous setting and that no duty was owed. And the Court did not employ these statutes or regulations to impose a duty.
 {¶ 59} Thus, the trial court correctly concluded the Freshwaters owed no duty to Solanki. Since the Freshwaters owed no duty to Solanki, summary judgment was proper. Accordingly, appellants' first assignment of error is without merit.
 {¶ 60} Appellants' second assignment of error states:
 {¶ 61} "THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT-APPELLEES SHAHS' MOTION FOR SUMMARY JUDGMENT."
 {¶ 62} Appellants contend that Solanki was the Shahs' invitee. They allege that Solanki agreed to coordinate the installation of the intercom system based on his friendship with Dr. Shah and that he did so without making any profit. Appellants state that the day before the accident, Dr. Shah called Solanki and asked him to go to the house to note the location of the intercom wires on the second floor. *Page 14 
Therefore, appellants contend, the Shahs owed Solanki a duty, as an invitee, to maintain the premises in a reasonably safe condition. Because the construction activities at their house were being done at their request and under their ultimate control, appellants assert the Shahs breached their duty owed to Solanki to maintain the house in a reasonably safe condition by installing a guard rail or some type of fall protection.
 {¶ 63} Next, appellants argue that assuming Solanki was an independent contractor, summary judgment was still improper. They claim that Dr. Shah actively participated in Solanki's work by directing him where the system was to be installed and by directing him to go to the house to note the location of the wires before the drywall was hung. Furthermore, appellants assert that Solanki's work was not inherently dangerous. They point out that at the time of his fall, Solanki was merely walking from one bedroom to the next and noting the location of wires.
 {¶ 64} Finally, appellants argue that the open and obvious doctrine does not apply because Dr. Shah actively participated in Solanki's work. And they claim that Solanki stepped on a board, which caused him to lose his balance and fall from the balcony. Whether the board was open and obvious, appellants argue, is a question for a jury.
 {¶ 65} Initially, we must determine whether the Shahs owed Solanki a duty of care. An "invitee" is a business visitor who is rightfully on the premises of another for purposes in which the possessor of the premises has a beneficial interest. Provencher v. Ohio Dept. ofTransp. (1990), 49 Ohio St.3d 265, 265-66, 551 N.E.2d 1257; Scheibel v.Lipton (1951), 156 Ohio St. 308, 328-29, 102 N.E.2d 453. A property owner owes a duty to an invitee to exercise ordinary care and to protect the invitee by maintaining the premises in a safe condition. Light v.Ohio University (1986), 28 Ohio St.3d 66, 68, 502 N.E.2d 611. However, owners of premises do not generally owe a duty to independent contractors where the work being performed is inherently dangerous.Routzahn v. Garrison, 2d Dist. No. 21190, 2006-Ohio-3652, at ¶ 49. An exception exists if the owner actively participates in the independent *Page 15 
contractor's work. Hirschbach v. Cincinnati Gas Elec. Co. (1983),6 Ohio St.3d 206, 452 N.E.2d 326, at the syllabus.
 {¶ 66} "[A]ctive participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, or where the owner retains or exercises control over a critical variable in the workplace." Sopkovich, 81 Ohio St.3d at 643. A general supervisory role is not enough to constitute "active participation." Bond, 72 Ohio St.3 at 337.
 {¶ 67} In this case, Solanki was an independent contractor engaged in inherently dangerous work. Solanki was hired by the Shahs to install home theater and intercom systems. (Solanki Dep. 62-63, 90-91; A. Shah Dep. 16-17). And as discussed above, Solanki's work in this case was inherently dangerous because it took place in a house that was under active construction. Therefore, the only way the Shahs would owe Solanki a duty was if they actively participated in his work.
 {¶ 68} Solanki stated that the Shahs gave him directions as to how to go about the installation of the home theater and intercom systems. (Solanki Dep. 91-92). The Shahs told Solanki where they wanted speakers placed. (Solanki Dep. 92-93). Solanki stated that he made recommendations to the Shahs about various aspects of the systems, such as what brands to use, and the Shahs went with his recommendations. (Solanki Dep. 96-97). Solanki also stated that Dr. Shah told him that the builders were going to hang the drywall and that the wire mapping had to be done before the builders hung the drywall. (Solanki Dep. 170-71). However, he stated that no one told him what time to be there or how to do his drawings. (Solanki Dep. 170-71). Solanki further agreed that the Shahs did not know much about installing the systems and that he explained things to them. (Solanki Dep. 96). Additionally, the Shahs did not provide Solanki with any tools or equipment. (A. Shah Dep. 115).
 {¶ 69} Given these undisputed facts, we cannot conclude that the Shahs actively participated in Solanki's work. Active participation requires some direct *Page 16 
involvement in a contractor's work, such as instructing how to perform a task as opposed to simply when and where to perform it. Taylor v. B.P.Exploration Oil, Inc. (1994), 96 Ohio App.3d 318, 323,644 N.E.2d 1124. The Shahs merely instructed Solanki as to what they wanted in their house and where they wanted speakers to be located. They then followed Solanki's recommendations as to more detailed matters. The Shahs simply directed Solanki to perform a task — install the systems, locate the speakers in certain locations, and map the wires before the drywall was hung. But the Shahs did not control how Solanki was to go about completing the task.
 {¶ 70} Because Solanki was engaged in inherently dangerous work and the Shahs did not actively participate in his work, the Shahs owed no duty to Solanki.
 {¶ 71} Furthermore, even if Solanki's work had not been inherently dangerous or even if the Shahs had actively participated in Solanki's work, the Shahs still would not have owed Solanki a duty of care because the open area on the second floor balcony from which Solanki fell was so open and obvious that they owed him no duty to warn him of it. The "open and obvious" doctrine provides that a property owner owes no duty to warn invitees entering the property of open and obvious dangers on the property. Sidle v. Humphrey (1968), 13 Ohio St.2d 45, 233 N.E.2d 589, paragraph one of the syllabus. Open and obvious dangers are dangers that are either known by the plaintiff or are so apparent that the plaintiff would reasonably be expected to discover and protect against them.Bundschu v. Naffah, 147 Ohio App.3d 105, 110, 768 N.E.2d 1215,2002-Ohio-607, at ¶ 28.
 {¶ 72} Solanki described how he fell from the second floor hallway. The hallway was approximately 20 to 30 feet long. (Solanki Dep. 132-33). He stated that as he was walking down the hallway from one bedroom to the next, he stepped on a loose board, lost his balance, and fell. (Solanki Dep. 110-11). Solanki stated that he was looking straight ahead and did not see the board. (Solanki Dep. 112-14). He further stated that he had walked back and forth more than once before he fell and never saw a board in the hallway. (Solanki Dep. 116). Solanki admitted that he *Page 17 
never actually saw a board; however, he was sure that he stepped on one. (Solanki Dep. 116-17). Solanki stated that when he started to fall he tried to grab for something but there was nothing to hold onto. (Solanki Dep. 121-22). He stated that the side he fell from was completely open. (Solanki Dep. 123). And while Solanki would not admit that he noticed that there was no railing on the hallway before his fall, he did state that there was nothing blocking his view to notice that there was no railing. (Solanki Dep. 167-68).
 {¶ 73} Dr. Shah stated that there was no railing in the hallway prior to Solanki's fall. (A. Shah Dep. 112). Dr. Shah stated that anyone who walked into the house would have seen that there was no railing and that nothing was hiding the lack of railing. (A. Shah Dep. 112-13).
 {¶ 74} Solanki stated that he had been in the Shahs' house seven or eight times prior to his fall and that he had been on the second floor three or four times. (Solanki Dep. 104, 106). And Solanki admitted that he had walked across the balcony numerous times before his fall. (Solanki Dep. 131-32).
 {¶ 75} The lack of a railing on the second floor balcony was open and obvious. According to Solanki, the hallway was 20 to 30 feet long and completely open on the side from which he fell. No railing existed and nothing was blocking the view of anyone in the hallway from seeing that no railing existed. Courts have held that where the plaintiff was aware of a lack of a railing, the danger is open and obvious. Ault v.Provenza (May 15, 1996), 9th Dist. No. 95CA006210 (lack of handrail on stairwell was open and obvious to an invitee by simply glancing at the stairwell); Primavera v. Guthery (June 24, 1996), 3d Dist. No. 9-96-11 (plaintiff was aware of general unsafe condition of barn, including lack of guardrails in certain areas, and therefore, "[h]er awareness of each specific hazard present in the barn is not necessary for us to conclude as a matter of law that the overall hazardous condition of the barn was an open and obvious danger.").
 {¶ 76} Furthermore, while Solanki did not admit that he noticed that there was no railing, he admitted that, prior to his fall, he had been in the Shah house seven or *Page 18 
eight times, had been upstairs three or four times, and had been back and forth across the hallway numerous times that day. This court has held that knowledge of a condition may be shown by prior usage.Zuzan v. Shutrump, 155 Ohio App.3d 589, 802 N.E.2d 683, 2003-Ohio-7285, at ¶ 14 (carpet installer who walked across stoop at least four times prior to falling had imputed knowledge of a crack in the stoop).
 {¶ 77} Appellants contend also that Solanki stepped on a board, which caused him to lose his balance and fall from the open hallway. They assert that the board was not open and obvious. There is not much evidence about this board. Solanki simply stated that he tripped on a loose board. However, he admits that he never saw the board and could not describe it. (Solanki Dep. 153-54). Solanki further stated that had he looked down when he was walking across the hallway, he would have seen the board. (Solanki Dep. 141-42).
 {¶ 78} Again, Solanki stated that he had walked back and forth across the hallway numerous times before falling. Therefore, his prior usage of the hallway that day should have given him knowledge of any loose boards. Zuzan, supra.
 {¶ 79} Thus, even if Solanki was not engaged in inherently dangerous work or the Shahs had actively participated in Solanki's work, the Shahs nonetheless did not owe Solanki a duty because the open second-floor balcony was open and obvious and any loose board should have been open and obvious to Solanki. Therefore, the trial court properly granted summary judgment in favor of the Shahs. Consequently, appellants' second assignment of error is without merit. *Page 19 
 {¶ 80} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1