[Cite as *Weitzel v. Bryson/Tucker Elec., L.L.C.*, 2025-Ohio-2577.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Robert Weitzel, et al. | Court of Appeals No.  L-24-1114 |
| Appellants | Trial Court No.  CI-22-3049 |
| v. | |
| Bryson/Tucker Electric, LLC. | **DECISION AND JUDGMENT** |
| Appellees | Decided: July 22, 2025 |

* * * * *

Kevin Boissoneault and Jonathon Ashton, for appellants.

Milton Pommeranz and Richard Malone, for appellee, Bryson/Tucker Electric,

LLC.

Mark Seitzinger, for appellees GEM Industrial, Inc. and Rudolph/Libbe, Inc.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, Robert Weitzel, appeals the April 16, 2024 order of the Lucas

County Court of Common Pleas granting summary judgment in favor of appellees

Rudolph/Libbe Inc. (RLI) and GEM Industrial, Inc. (GEM) and dismissing appellant's

negligence claims. Appellant also appeals a second April 16, 2024 order of the Lucas County Court of Common Pleas granting summary judgment in favor of appellee Bryson/Tucker Electric, LLC (BTE) and dismissing appellant's intentional tort claim. Because we find that no genuine issue of material fact remains and appellees were entitled to summary judgment, we affirm the trial court's orders.

## II. Background

{¶ 2} On June 6, 2017, appellant was injured when he stepped through an unmarked and uncovered hole. At the time of his injury, appellant was working for his employer, BTE, an electrical subcontractor, on a construction project at a manufacturing facility. RLI was the general contractor for the project, and GEM was another subcontractor.

{¶ 3} Appellant filed two complaints in Lucas County Common Pleas Court seeking damages for his injury, one asserting an intentional tort claim against BTE and the other asserting negligence/recklessness claims against RLI and GEM.[1] The cases were consolidated. After the parties engaged in discovery, RLI and GEM moved for summary judgment on appellant's negligence claims against them, arguing that there was no genuine issue of material fact to support that they had actively participated in appellant's work activities and therefore they did not owe him a duty of care. BTE filed its own motion for summary judgment, arguing that appellant could not maintain an

---

[1] Appellant voluntarily dismissed his original complaints and refiled them pursuant to Civ.R. 41(A).

2.

intentional tort claim against BTE because appellant had failed to establish a genuine issue of material fact that BTE acted with a deliberate intent to injure appellant. The trial court granted both motions.

## A. Factual Background

{¶ 4} During discovery, three individuals who worked for BTE on the construction project were deposed: appellant; Tim Warren, appellant's co-worker; and Juan Duarte, appellant's foreman. The following facts are drawn from their depositions unless otherwise indicated.

### *Appellant's Injury*

{¶ 5} On the date of his injury, appellant and Warren, who were both electricians working for BTE on a construction project at a manufacturing facility, went to Duarte, their foreman and a BTE employee, for a new assignment after finishing up some other work. Duarte instructed appellant and Warren to go up to a mezzanine level to assist two other BTE employees, Jose Mandragon and Scott Bledsoe. GEM was hoisting electrical equipment from the ground floor up to the mezzanine level, where Mandragon and Bledsoe would receive the equipment and then install it. Duarte did not tell appellant and Warren that they needed any fall protection when they were on the mezzanine. Appellant later testified that while he wore several forms of personal protective equipment daily, the decision on whether fall protection was necessary was made by his foreman.

{¶ 6} When appellant and Warren went to the stairs for the mezzanine, they discovered that the base of the staircase was barricaded. The barricade consisted of a

3.

board and a pipe affixed across the staircase. The board was about four feet above the ground and covered in red tape that said "danger," and the pipe was below the board.

{¶ 7} Appellant and Warren then returned to Duarte, told him about the barricade and the danger tape, and asked whether they were permitted to go up to the mezzanine. Duarte told appellant and Warren that they were cleared to go up there. In appellant's written statement with the incident report, he wrote, "[Duarte] then told us that we had permission from GEM to go receive the gear beyond the danger tape and that it was fine for us to proceed." Later, appellant testified that Duarte told them that it was "safe" for them to go up to the mezzanine.

{¶ 8} Duarte testified that he told appellant and Warren that there were holes in the mezzanine flooring where the equipment was to be placed and cautioned them to be careful around the holes. However, appellant and Warren both denied that Duarte mentioned any holes. Warren testified that Duarte told them they were supposed to help receive equipment being lifted to the mezzanine, but Duarte did not tell them that the equipment was supposed to be installed in a hole in the mezzanine floor. Appellant similarly testified that Duarte only told them that they should assist with receiving the equipment, and appellant did not know what they were going to do with the equipment. Warren and appellant both testified that they did not know there were holes in the mezzanine flooring, they had never been to the mezzanine level before, and beyond the general warning about "danger" at the bottom of the staircase, they had no knowledge of any specific safety issues on the mezzanine before they went up there. Appellant and

4.

Warren both admitted that they did not ask Duarte why the stairs had been barricaded nor did they inquire into the source of the "danger."

{¶ 9} When appellant and Warren returned to the staircase, they used a ladder to climb over the barricade so they could get to the staircase. They proceeded to the mezzanine level where they saw Mandragon and Bledsoe, the two BTE employees they had been instructed to assist. Appellant and Warren also observed two GEM ironworkers on the mezzanine. The electrical equipment was in the process of being lifted up to the mezzanine as appellant and Warren arrived. Appellant testified that as he walked along the mezzanine, he was focused on the equipment being lifted, so he was not looking at the floor, and he fell into an uncovered and unmarked hole. Fortunately, appellant was able to avoid falling all the way to the ground floor—which was approximately 20 feet below the mezzanine—by grabbing onto the sides of the hole. Warren, who had been walking behind appellant at the time of the fall, and others were able to help appellant up and lead him down to safety. As a result of his fall, appellant injured his shoulder and knee.

### The Mezzanine Holes & BTE's Safety Measures

{¶ 10} The flooring of the mezzanine level, which was made out of metal grating, was designed to have large holes where electrical equipment was to be installed. Both Duarte and Warren testified that they believed that GEM, which employed millwrights and ironworkers, made the mezzanine flooring.

5.

**{¶ 11}** At some point prior to appellant's accident, Duarte reviewed the prints for the mezzanine level, which indicated the locations of the holes where electrical equipment was to be installed. Duarte also went up to the mezzanine level several times in the days before appellant's accident so he could locate the holes, which Duarte testified were uncovered and unmarked every time he was on the mezzanine. In addition, before appellant's injury that day, Duarte escorted Mandragon and Bledsoe to the mezzanine and pointed out the holes to them, and the holes were also uncovered and unmarked then as well. Despite the presence of unmarked and uncovered holes, Duarte did not use any fall protection equipment at any time when he was on the mezzanine level, nor did he instruct any BTE employee to use such protective equipment.

**{¶ 12}** Moreover, according to Duarte, neither the board nor the danger tape had been at the bottom of the staircase on any of his visits to the mezzanine level. No evidence was presented as to who installed the safety barricade or the reason why the barricade was erected, though Duarte speculated that the board and tape may have been installed by Mandragon and Bledsoe to prevent others from going onto the mezzanine while they were installing the electrical equipment.

**{¶ 13}** Duarte testified BTE gave him job-specific safety policies and procedures. All three deponents—Warren, Duarte, and appellant—testified that BTE conducted daily safety talks with employees. Nonetheless, Duarte testified that he had never been provided any training regarding OSHA requirements for hole coverings on walking-working surfaces above certain elevations, nor was he familiar with those regulations.

6.

{¶ 14} At his deposition, appellant, who had been an electrician for decades and worked on multiple construction projects in manufacturing facilities, testified that when an electrician needs to install equipment into holes in flooring, the contractor that creates the holes is responsible for covering them, and the electrician only removes the hole coverings once the equipment is on the mezzanine and ready to be placed.

### GEM's Involvement

{¶ 15} As to GEM, both Duarte and appellant testified that they received no direction or instruction from GEM in completing their work. Duarte testified that he asked a GEM employee for assistance in hoisting the electrical equipment from the ground to the mezzanine level, and a GEM operator used a lifting unit to do so. According to Duarte, no GEM employee was involved in placing and installing the equipment on the mezzanine.

{¶ 16} Two GEM employees were present on the mezzanine at the time of appellant's accident, but the testimony differed regarding their location and involvement in BTE's work. Duarte testified that when he was on the mezzanine earlier with Mandragon and Bledsoe, the two GEM employees were engaged in other work in a different part of the mezzanine, out of the vicinity of the area where BTE would be receiving and installing the equipment. Appellant, however, testified that when he went to the mezzanine level, he saw two GEM employees with Mandragon and Bledsoe, and the GEM employees were assisting with receiving the lifted equipment and passing it onto BTE employees. As part of his written statement regarding the accident, the

7.

accuracy of which he confirmed during his deposition, Warren drew a diagram showing that Mandragon and Bledsoe were on one side of the two panels being lifted to the mezzanine, and the two GEM workers, whom he designated as iron workers, were a short distance farther down the mezzanine, on the other side of the two panels.

{¶ 17} Duarte also testified that GEM gave him permission to work on the mezzanine level, but he could not remember which GEM employee did so. He characterized the permission he received as "blanket, more or less, because we had work up there." He further explained that "it was a blanket permission from [GEM] for people that needed to work up there that it was okay to go up there." However, he could not remember which GEM employee gave him permission.

### RLI's Involvement

{¶ 18} RLI's contracts with its subcontractors contained several provisions requiring the subcontractors to comply with certain safety measures.[2] Many of the safety measures the subcontractors were required to perform were general, such as complying with federal, state, and local health and safety regulations; and immediately correcting "undesirable work practices or conditions." Other provisions were more specific, such as requiring employees to wear high-visibility clothing and to use fall protection when

---

[2] Appellant submitted portions of what appears to be RLI's contract with subcontractor as exhibits to its memorandum in opposition to RLI and GEM's motion for summary judgment. The submitted portions contain safety provisions. Although the portions of the contract were not submitted in conjunction with an affidavit or deposition testimony, no parties objected to the trial court's consideration of them.

8.

working above six feet.  The contract also required subcontractors to have daily safety meetings with employees, but those meetings were conducted by the subcontractors, not RLI.  Moreover, the contract expressly provided that BTE was responsible for its own employees' safety.

{¶ 19} There was no evidence submitted that RLI participated in the specific activities involved in appellant's injury.  Appellant testified that his only direction on the job was from his foreman, Duarte.  Duarte testified that he got his direction from higher-ups within BTE, and BTE provided him with the job-specific safety policies and procedures.  There was no evidence that any RLI employee was present on the mezzanine or otherwise in the vicinity of the mezzanine during appellant's accident, nor was there any evidence that RLI participated in the placement and installation of the electrical equipment or in the construction of the mezzanine.  There was also no evidence that RLI was involved in the decision to leave the holes uncovered and unmarked or to send appellant to work on the mezzanine without fall protection.

### A.  Motions for Summary Judgment

{¶ 20} Two motions for summary judgment were filed.  RLI and GEM jointly moved for summary judgment on the negligence claims against them, and BTE moved separately for summary judgment on the intentional tort claim against it.

### *RLI and GEM's Motion for Summary Judgment*

{¶ 21} In their motion for summary judgment, RLI and GEM argued that because a construction site in a manufacturing facility is an inherently dangerous setting, they

9.

owed no duty of care to appellant unless they actively participated in his work, which they did not. They pointed out that neither GEM nor RLI gave appellant any direction or guidance in his work and instead all of his direction came from Duarte, a BTE foreman. Likewise, they contended that neither GEM nor RLI gave permission for the critical acts that led to appellant's injuries, which they maintained were appellant's decision to climb over the barricade and his failure to exercise caution after climbing over that barricade.

{¶ 22} Appellant opposed the motion, arguing that RLI retained control over the premises and assigned subcontractors with specific jobs, as evidenced by change orders RLI issued, including the work involving the electrical equipment on the mezzanine, and RLI required subcontractors to follow several safety requirements. Appellant also alleged that because GEM created the holes, failed to cover and mark the holes, gave Duarte permission for appellant to work on the mezzanine, and GEM employees were present on the mezzanine at the time of appellant's accident, GEM actively participated in his work and created the critical issue that caused appellant's injury, the uncovered and unmarked hole.

### *BTE's Motion for Summary Judgment*

{¶ 23} In its motion for summary judgment, BTE argued that there was no evidence that anyone at BTE acted with deliberate intent to injure appellant and therefore appellant could not pursue an intentional tort claim against BTE. They contended that they could not be substantially certain that appellant would be injured when he was merely instructed to perform job duties similar to those he had performed many times.

10.

They also argued that no one from BTE removed an equipment safety guard, maintaining that the holes were not created by BTE nor did BTE remove any cover from the hole and a safety barricade is not an equipment safety guard. Instead, they pointed to GEM as the party that told Duarte that the mezzanine was safe.

{¶ 24} Opposing the motion, appellant argued that Duarte's actions evidenced a deliberate intent to injure appellant because Duarte instructed appellant to bypass the barricade, assured him that the mezzanine was safe, and did not warn appellant of the hazard even though Duarte knew there were uncovered holes in the mezzanine flooring. Appellant further alleged that instructing him to bypass a safety barricade also constitutes the removal of a safety guard.

{¶ 25} RLI and GEM filed their own response to BTE's motion for summary judgment as well. They argued that appellant had not set forth sufficient evidence that GEM gave Duarte permission for BTE employees to work on the mezzanine. More specifically, GEM and RLI pointed out that Duarte could not remember the GEM employee who gave him permission for BTE employees to go up to the mezzanine, Duarte only "vaguely" recalled relaying that information to Warren and appellant, and appellant's and Warren's testimony regarding Duarte's statement about permission from GEM was hearsay. They concluded that any fact issue regarding GEM's permission to Duarte was not genuine.

11.

## C. The Trial Court's Orders Granting Summary Judgment

**{¶ 26}** The trial court issued two separate orders, both granting summary judgment. In the first order, the trial court granted summary judgment to RLI and GEM on appellant's negligence claims against them. In the second, the trial court granted summary judgment to BTE on appellant's employer intentional tort claim. Because no claims remained, appellant's complaints were dismissed.

### *The Trial Court's Order Granting Summary Judgment to RLI and GEM*

**{¶ 27}** In its first order, the trial court granted RLI and GEM's motion for summary judgment, holding that there was no genuine issue of material fact that either RLI or GEM owed appellant a duty of care because neither party actively participated in appellant's work or controlled a critical aspect of safety.

**{¶ 28}** As to RLI, the trial court found that the contractual safety provisions contained boilerplate language that merely required contractors' adherence to certain safety standards without any specific direction or control on the means or manner in which appellant performed his work. Similarly, the trial court found that the change orders evidenced that RLI coordinated the subcontractors' projects but were not evidence that RLI directed or guided the subcontractors in the means or manner in which the projects were completed.

**{¶ 29}** As to GEM, the trial court found that the evidence "establishes that GEM was not actively working on the mezzanine at the time of [appellant's] injury, and only [BTE] employees were in the area." The trial court further found that appellant's actions

12.

in crossing into a dangerous area without safety precautions was the critical act that led to his injury and that appellant was directed to do so by his own employer, not GEM.

### The Trial Court's Order Granting Summary Judgment to BTE

{¶ 30} The trial court held that there was no genuine issue of material fact to support that BTE acted with deliberate intent to injure under R.C. 2745.01. First, the court found that in instructing appellant that it was safe to go to the mezzanine despite knowing that the mezzanine flooring contained uncovered, unmarked holes, Duarte was at most negligent. Next, the court held that the presumption of deliberate intent under R.C. 2745.01(C) did not apply because a physical barrier over a hole is not an equipment safety guard as a matter of law.

### III. Assignment of Error

{¶ 31} Appellant timely appealed both orders and asserts the following errors for our review:

1. The trial court erred when it granted summary judgment in favor of Appellees GEM Industrial, Inc. and Rudolph/Libbe, Inc.

2. The trial [c]ourt erred when it granted summary judgment in favor of Appellee Bryson/Tucker Electric, LLC.

### IV. Law and Analysis

{¶ 32} In both assignments of error, appellant argues that the trial court erred in granting appellees' motions for summary judgment and dismissing his complaints. We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129

13.

(9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶ 33} A "material fact" is one which would affect the outcome of the proceeding under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, "[w]hether a political subdivision or its employee may invoke statutory immunity under R.C. Chapter 2744 generally presents a question of law." *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, ¶ 38 (4th Dist.).

{¶ 34} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party must point to some evidence in the record in the form of "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Civ.R. 56(C); *Dresher* at 292-293. The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact

14.

does exist. *Dresher* at 293. The failure to satisfy this reciprocal burden warrants judgment against the nonmoving party. *Id.*

**A. The trial court properly granted summary judgment in favor of RLI and GEM.**

{¶ 35} In his first assignment of error, appellant contends that the trial court erred in finding that RLI and GEM did not actively participate in his work and therefore did not owe a duty of care to appellant and could not be liable for negligence as a matter of law. Appellant maintains that GEM owed him a duty of care because GEM was involved in the work in lifting the electrical equipment to the mezzanine and GEM gave permission for the critical act. Appellant also alleges that RLI likewise owed him a duty of care because RLI retained control over workplace safety on the construction project.

{¶ 36} "[O]ne who engages an independent contractor to do work for him ordinarily owes no duty of protection to the employees of such contractor, in connection with the execution of the work, who proceeds therewith knowing and appreciating that there is a condition of danger surrounding its performance." *Wellman v. E. Ohio Gas Co.*, 160 Ohio St. 103, 108 (1953). Indeed, "if notice of dangerous conditions is given to the independent contractor, the employer of the contractor has performed his duty so far as it applies to the employees of the contractor." *Schwarz v. Gen. Elec. Realty Corp.*, 163 Ohio St. 354, 359-60 (1955). If, however, the employer of the contractor actively participates in the contractor's work, then the contractor's employer owes the contractor's employees a duty of care. *See id.* at 359.

15.

**1. RLI did not actively participate in appellant's work.**

{¶ 37} "A general contractor who has not actively participated in [a] subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 335 (1995), quoting *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110 (1986), syllabus (Emphasis omitted). "For purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project." *Id*. at syllabus.

{¶ 38} In *Cafferkey*, the Ohio Supreme Court concluded that the general contractor's retention of certain job-site safety concerns, as evidenced by a one-page safety document and "'boilerplate' terminology common to virtually all construction contracts" in its contract with the subcontractor, was insufficient to establish that the general contractor actively participated in the subcontractor's work. *Id*. at 113. The court explained that the general contractor's retention of control over safety "did not empower [the general contractor] to control the means or manner of [the subcontractor's] performance," and instead, "the details of [the subcontractor's] performance were directed and carried out solely by [the subcontractor's] employees." *Id*.

{¶ 39} Similarly, in *Bond*, provisions in the general contractor's contract with the subcontractor "demonstrate[d] that [the general contractor] retained control over safety policies and procedures at the site," but the Ohio Supreme Court nonetheless held that the general contractor did not owe a duty of care to the injured employee of a subcontractor. *Bond* at 336. In that case, the Ohio Supreme Court noted that the general contractor retained control over safety, performed daily inspections of the subcontractor's work, and on one occasion had required the subcontractor to correct scaffolding that the subcontractor had improperly erected. *Id.* at 337. In determining that these activities were insufficient to give rise to a duty of care to the subcontractor's employees, the court explained, "[t]he general contractor's retention of the authority to monitor and coordinate activities of subcontractors and the retention of control over safety policies and procedures do not rise to the level of active participation, thereby extending a duty of care from a general contractor to a subcontractor's employees." *Id.* at 336-37, citing *Cafferkey* at 113.

{¶ 40} Here, RLI's contract with BTE demonstrates that RLI retained significant control of safety at the construction project. RLI required BTE to comply with applicable safety laws and regulations as well as many specific safety standards, such as requiring fall protection when working at certain elevations. However, the contract also provided that BTE was responsible for its own employees' safety, and BTE solely conducted the daily safety meetings with its employees and distributed the job-specific safety policies and procedures to BTE employees. Further, while RLI coordinated the activities of the various subcontractors involved in the project, as evidenced by the change orders

17.

submitted by appellant, there was no evidence presented that RLI directed or provided any guidance to BTE in the means or manner in which BTE performed its work. Moreover, there was no evidence that RLI was involved whatsoever in the decision to direct appellant to climb over the safety barricade and work on the mezzanine near uncovered and unguarded holes without instructing him to wear personal fall protection.

{¶ 41} Because appellant failed to present evidence to create a genuine issue of material fact regarding RLI's active participation in BTE's work, the trial court properly determined that RLI owed no duty of care to appellant as a matter of law and RLI was entitled to summary judgment.

**2. GEM did not actively participate in appellant's work.**

{¶ 42} Appellant next contends in support of his first assignment of error that the trial court erred in granting summary judgment in favor of GEM. Appellant contends that because a genuine issue of material fact remains on GEM's active participation in BTE's work, dismissal of his negligence claim against GEM was improper.

{¶ 43} Just as a general contractor generally owes no duty to a subcontractor's employee, "[a]n independent contractor who lacks a contractual relationship with a second independent contractor owes no affirmative duty beyond that of ordinary care to the employees of the second contractor, where the first contractor does not supervise or actively participate in the second contractor's work." *Kucharski v. Natl. Eng. & Contr. Co.*, 69 Ohio St.3d 430 (1994), syllabus. In such circumstances, the second contractor's "duty of ordinary care … is eliminated 'because [the injured independent contractor]

18.

should have been aware of the dangers of his work and protected himself against them.'" *Oliphant v. AWP, Inc.*, 2020-Ohio-229, ¶ 37 (12th Dist.), quoting *Solanki v. Doug Freshwater Contracting, Inc.*, 2007-Ohio-6703, ¶ 43-44 (7th Dist.). "To hold otherwise would mean that '[the first subcontractor] would have owed [the second subcontractor] a greater duty of care than an owner, general contractor, or construction manager would have.'" *Ellis v. Time Warner Cable, Inc.*, 2013-Ohio-240, ¶ 10 (1st Dist.), quoting *Pinkerton v. J.&H Reinforcing & Structural Erectors, Inc.*, 2012-Ohio-1606, ¶ 26 (4th Dist.).

{¶ 44} In the context of a negligence claim of one subcontractor's employees against a second subcontractor, "'actively participated' means that a fellow independent contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury." *Oliphant* at ¶ 37, quoting *Pinkerton* at ¶ 34. Where the means and manner of an employee's work activities—including the specific activity involved in the employee's injury—is dictated solely by the employee's own supervisor, then courts generally hold that a second contractor has not "directed" the activity. *See, e.g., Oliphant* at ¶ 38 (holding that where an employee of subcontractor on a project installing electrical poles along a road was injured when hit by traffic during a meeting and a second subcontractor was responsible for creating a work zone, the second subcontractor did not direct the employee's activity because employee's supervisor determined the time and place of the meeting); *Rembowski v. Rudolph/Libbe Inc.*, 2020-Ohio-2864, ¶ 28 (6th Dist.) (holding that where one

subcontractor left a hole unguarded, the subcontractor was not liable for the injury of an employee of a second subcontractor because the employee entered the area at the direction of his own supervisor and not at the direction of the first subcontractor).

{¶ 45} Here, there is no evidence that GEM "directed" the activity that resulted in the injury. Appellant testified that all of his instructions came from Duarte, including his work assignments and whether he should wear fall protection. Only Duarte instructed appellant to enter the mezzanine and to bypass the safety barricade. While GEM employees may have been present on the mezzanine and involved with lifting the equipment to the mezzanine, it is uncontroverted that Duarte initiated and coordinated the hoisting of the equipment to the mezzanine, not GEM. Furthermore, when Duarte instructed appellant to enter the mezzanine, Duarte was aware of the location of the holes in the flooring and that they were uncovered and unguarded.

{¶ 46} Next, even if GEM gave permission to Duarte for BTE employees to work on the mezzanine—or even further, represented that it was safe for BTE employees to work there, as appellant testified—the critical act was directing appellant to enter the mezzanine without instructing him to wear personal fall protection despite being aware of the uncovered and unmarked holes. There is no evidence that GEM gave permission for BTE employees to work on the mezzanine without using personal fall protection. Moreover, Duarte not only knew about the uncovered and unmarked holes on the mezzanine, he directed appellant to go to the mezzanine and did not tell him that he needed to wear personal fall protection.

20.

{¶ 47} Indeed, the reason why a contractor's duty of care to the employees of a second contractor is limited in circumstances involving an inherently dangerous activity is that the second contractor is generally aware of the danger and therefore responsible to protect its employees against the danger. *See Ellis*, 2013-Ohio-240 at ¶ 8, quoting *Salanki v. Doug Freshwater Contracting, Inc.*, 2007-Ohio-6703, ¶ 44 (7th Dist.) ("[I]f the property owner or general contractor hires the independent contractor or subcontractor to perform inherently dangerous work, then [the duty of care] is eliminated because of the intrinsic risk in the work, of which the independent contractor or subcontractor is aware and should guard against.") To hold that GEM owed appellant a duty of care with respect to the open holes on the mezzanine when appellant's own supervisor was aware of their exact locations and that they were uncovered and unmarked would contradict that basic principle and put the onus on GEM to protect BTE employees against dangers despite BTE's awareness of the particular risk of those dangers.

{¶ 48} The trial court properly determined that GEM did not owe appellant a duty of care and therefore could not be liable for negligence and therefore GEM was entitled to summary judgment. Because both GEM and RLI were entitled to summary judgment, appellant's first assignment of error is not well-taken.

**B. The trial court properly granted summary judgment in favor of BTE.**

{¶ 49} In his second assignment of error, appellant argues that the trial court improperly granted BTE's motion for summary judgment and dismissing his intentional tort claim against BTE, his employer. Appellant contends that genuine issues of material

21.

fact remain regarding whether BTE may be liable for his workplace injuries because Duarte's knowledge of the uncovered, unmarked holes in the mezzanine combined with Duarte's instruction to appellant to work on the mezzanine without warning him of the danger evidences a deliberate intent to injure.

{¶ 50} An employee's exclusive remedy for a workplace injury is generally workers' compensation. *Hoyle v. DTJ Ents., Inc.*, 2015-Ohio-843, ¶ 7. Accordingly, an employer is generally immune from civil liability for damages arising out of an employee's workplace injury. *Id*. However, if the employer intentionally acts to injure its employee, then the injury is outside the employment relationship and the employer may be liable for an intentional tort. *Id*.

{¶ 51} Under R.C. 2745.01(A), an employer may be liable for an employee's workplace injury if "the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur." R.C. 2745.01(B) defines "substantially certain" as when "an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." R.C. 2745.01(B). Absent direct evidence of intent, however, an employee can also create a rebuttable presumption of an employer's deliberate intent in the event of "deliberate removal by an employer of an equipment safety guard." R.C. 2745.01(C); *see also Hoyle* at ¶ 12.

{¶ 52} Notably, the Ohio Supreme Court has emphasized that an employer cannot be civilly liable for an employee's accidental workplace injury, no matter how egregious

22.

the employer's conduct, unless the employer actually intended to injure the employee, explaining as follows:

> "[T]he common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury."

*Houdek v. ThyssenKrupp Materials N.A., Inc.*, 2012-Ohio-5685, ¶ 23, quoting *Kaminski v. Metal & Wire Prods. Co.*, 2010-Ohio-1027, ¶ 100, quoting 6 Larson's Workers' Compensation Law (2008), Section 103.03.

{¶ 53} As such, "an employer's mere knowledge of a hazardous condition is insufficient to show intent to injure under R.C. 2745.01." *Bechtel v. Multi-Cast Corp.*, 2024-Ohio-3426, ¶ 29 (6th Dist.), quoting *Camara v. Gill Dairy, LLC*, 2023-Ohio-2339, ¶ 28 (12th Dist.), citing *Houdek* at ¶ 24. *See also Moore v. ThorWorks Industries, Inc.*, 2024-Ohio-1617, ¶ 67 (6th Dist.) ("[E]ven assuming that [the employer] was aware of a dangerous situation and directed [the injured worker] to continue working near that danger, … such facts do not rise to the level of demonstrating a deliberate intent to injure."). Likewise, an employer's recklessness or violation of a safety regulation is also insufficient to establish the employer's intent to injure. *See Moore* at ¶ 105 (6th Dist.) (explaining that removal of a statement that employer should have "listen[ed] to OSHA" from an incident report "is of … little consequence to the question of whether [the employer] deliberately and specifically intended to injure the [injured worker]"); *Fickle v.*

23.

*Conversion Techs. Intern., Inc.*, 2011-Ohio-2960, ¶ 48 (6th Dist.) ("While the conduct of [the employer] in requiring [the injured worker] to splice the material together by hand on an unguarded roller may be reckless, there is no evidence that [the employer] acted with deliberate intent to injure its employees.").

{¶ 54} Indeed, several Ohio courts have held that "the failure to provide proper fall or other safety protection or to adhere to OSHA regulations does not create a genuine issue of fact as to whether the employer committed an intentional tort absent proof of a deliberate, conscious attempt to injure." *Pastroumas v. UCL, Inc.*, 2016-Ohio-4674, ¶ 30 (1st Dist.) (collecting cases). *See also Bechtel* at ¶ 18, 33 (holding that injured worker failed to establish that employer acted with deliberate intent to injure despite administrative agency's finding that employer's failure to comply with a safety regulation caused the injury). In another case before this court involving an employee's fall through an open hole, we explained that "[a]lthough [the employer] placed [the employee] in a potentially dangerous situation by leaving an open hole where workers could potentially fall through it and instructing [the employee to work in] an area near the hole, there is no indication that [the employer] failed to place guardrails with the deliberate, specific intention of someone getting hurt." *King v. Buildtech Ltd. Construction Dev.*, 2023-Ohio-1092, ¶ 46 (6th Dist.).

{¶ 55} Here, appellant has failed to set forth any evidence to support that BTE acted with the deliberate intent to injure appellant. Duarte's instruction to appellant to work in the mezzanine area without warning him of the uncovered, unmarked holes or

24.

instructing him to use fall protection put appellant into a dangerous situation, and it may have been reckless or violated safety regulations. However, there is no evidence that Duarte did so with the specific intent to harm appellant or anyone else, and we cannot infer that intent merely from Duarte's decision to put appellant into a dangerous situation. Accordingly, the trial court properly granted summary judgment in BTE's favor. Appellant's second assignment of error is not well-taken.

## V. Conclusion

{¶ 56} Appellant's assignments of error are not well-taken and we affirm the April 16, 2024 judgments of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.